FILED

2021 Sep-30  PM 03:32
U.S. DISTRICT COURT
N.D. OF ALABAMA



# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

| | | |
|---|---|---|
| CHRISTOPHER OGLETREE, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | Case No.   3:18-cv-01218-HNJ |
| | ) | |
| COLBERT COUNTY, ALABAMA, et al., | ) | |
| | ) | |
| Defendants | ) | |

| | | |
|---|---|---|
| TERRY RUSHING ALEXANDER, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | Case No.   3:18-cv-01296-HNJ |
| | ) | |
| COLBERT COUNTY, ALABAMA, et al., | ) | |
| | ) | |
| Defendants | ) | |

| | | |
|---|---|---|
| WILLIAM R. HARGROVE, as the Administrator of the Estate of Daniel Hargrove, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | Case No.   3:18-cv-01382-HNJ |
| | ) | |
| COLBERT COUNTY, ALABAMA, et al., | ) | |
| | ) | |
| Defendants | ) | |



WILLIAM J. KRYSTON, III,          )
                                  )
          Plaintiff               )
                                  )
     vs.                          )     Case No.   3:18-cv-01755-HNJ
                                  )
COLBERT COUNTY, ALABAMA,          )
et al.,                           )
                                  )
          Defendants              )

TIMMIE JAMES,                     )
                                  )
          Plaintiff               )
                                  )
     vs.                          )     Case No.   3:20-cv-00333-HNJ
                                  )
COLBERT COUNTY, ALABAMA,          )
et al.,                           )
                                  )
          Defendants              )

## MEMORANDUM OPINION AND ORDER

Christopher Ogletree, Terry Alexander, Daniel Hargrove,[1] William Kryston, and

Timmie James all suffered assaults by other inmates while detained in the Colbert

County, Alabama, jail.   They sued Colbert County, the Colbert County Sheriff, and the

Colbert County Jail Administrator pursuant to 42 U.S.C. § 1983 for deliberate

---

[1] Daniel Hargrove, the original plaintiff in 3:18-cv-01382-HNJ, died on April 24, 2020 (Doc. 68 in 3:18-cv-01382-HNJ), and on April 15, 2021, the court substituted William R. Hargrove, the Administrator of the Estate of Daniel Hargrove, as Plaintiff.   (Doc. 94 in 3:18-cv-01382-HNJ).

2

indifference in those Defendants' failure to protect Plaintiffs from an unreasonable risk of serious harm under the Fourteenth Amendment to the U.S. Constitution.

During the time period pertinent to the claims of Plaintiffs Ogletree and Alexander, DeShannon Bowling served as Jail Administrator, so those Plaintiffs named Bowling as a Defendant.   During the time period pertinent to the claims of Plaintiffs Hargrove, Kryston, and James, Marcus Rutland served as Jail Administrator, so those Plaintiffs named Rutland as a Defendant instead of Bowling.[2]   During the time period relevant to all Plaintiffs' claims, Frank Williamson served as the Colbert County Sheriff, so all Plaintiffs named Williamson as a Defendant.   (*See* Doc. 25 in 3:18-cv-01218-HNJ; Doc. 34 in 3:18-cv-01296-HNJ; Doc. 26 in 3:18-cv-01382-HNJ; Doc. 1 in 3:18-cv-01755-HNJ; Doc. 1 in 3:20-cv-00333-HNJ).[3]

---

[2] Plaintiffs Ogletree and Alexander spelled Bowling's first name "DeShawn" in their pleadings, but Bowling states the correct spelling is "DeShannon," and Plaintiffs have not disputed that amendment. *See* Doc. 85-47, ¶ 1 ("I am a Defendant in the cases filed by Christopher Ogletree and Terry Alexander, although I am misidentified as 'DeShawn' Bowling."). Bowling served as Jail Administrator from 2015 to June of 2017, when Rutland took over the position.   (*See id.* ¶ 2; Doc. 85-43, at 11; Doc. 85-44, ¶ 2).

[3] Plaintiffs Ogletree, Alexander, Hargrove, and Kryston also asserted other claims they have since conceded.   They asserted § 1983 claims for denial of care for a serious medical need against Williamson, Bowling, Rutland, Quality Correctional Health Care, Inc. ("QCHC"), the entity that contracted with the Jail to provide medical care to its detainees, and three employees of QCHC, Donald Kern, Johnny Bates, and Brenda Lawler.   Alexander also asserted such a claim against Heath Halcomb, another jailer. Ogletree, Alexander, Hargrove, and Kryston asserted state law claims for medical negligence against QCHC and its employees.   Hargrove asserted claims against Sheriff Williamson for violations of the Americans with Disabilities Act and the Rehabilitation Act.   (*See* Doc. 25 in 3:18-cv-01218-HNJ; Doc. 34 in 3:18-cv-01296-HNJ; Doc. 26 in 3:18-cv-01382-HNJ; Doc. 1 in 3:18-cv-01755-HNJ).   Ogletree, Alexander, Hargrove, and Kryston agreed to the dismissal of their claims against QCHC and its employees, and the court dismissed those claims on March 30, 2021. (Docs. 92, 94 in 3:18-cv-01218-HNJ; Docs. 98, 100 in 3:18-cv-01296-HNJ; Docs. 87, 89 in 3:18-cv-

3

Plaintiff Alexander also asserted his failure to protect claim against individual jailers Heath Halcomb and Marcus Rutland (who served as a jailer during Alexander's incarceration, before he became Jail Administrator).  (*See* Doc. 34 in 3:18-cv-01296-HNJ).   Plaintiffs sued all individual defendants in their respective personal capacities. (*See* Doc. 25 in 3:18-cv-01218-HNJ, ¶ 22; Doc. 34 in 3:18-cv-01296-HNJ, ¶ 25; Doc. 26 in 3:18-cv-01382-HNJ, ¶ 21; Doc. 1 in 3:18-cv-01755-HNJ, ¶ 21; Doc. 1 in 3:20-cv-00333-HNJ, ¶ 17).   The court consolidated these actions pursuant to Federal Rule of Civil Procedure 42(a) at the behest of the parties.

Defendants Colbert County, Williamson, Bowling, Rutland, and Halcomb filed motions for summary judgment in their favor on Plaintiffs' failure to protect claims. (Doc. 86 in 3:18-cv-01218-HNJ; Doc. 92 in 3:18-cv-01296-HNJ; Doc. 81 in 3:18-cv-01382-HNJ;  Doc. 72 in 3:18-cv-01755-HNJ;  Doc. 27 in 3:20-cv-00333-HNJ). Plaintiffs filed a consolidated response to those motions (Docs. 91, 93 in 3:18-cv-01218-HNJ; Docs. 97, 99 in 3:18-cv-01296-HNJ; Docs. 86, 88 in 3:18-cv-01382-HNJ; Docs.

_____

01382-HNJ; Docs. 78, 80 in 3:18-cv-01755-HNJ).   The court entered partial final judgment on the claims against QCHC and its employees on June 24, 2021.   (Doc. 104 in 3:18-cv-01218-HNJ; Doc. 110 in 3:18-cv-01296-HNJ; Doc. 102 in 3:18-cv-01382-HNJ; Doc. 90 in 3:18-cv-01755-HNJ). Plaintiffs also "agree to the dismissal of plaintiffs' medical care and ADA claims against the Colbert County defendants," so the court will dismiss those claims.   (Doc. 93 in 3:18-cv-01218-HNJ, at 9 n.1; Doc. 99 in 3:18-cv-01296-HNJ, at 9 n.1; Doc. 88 in 3:18-cv-01382-HNJ, at 9 n.1; Doc. 79 in 3:18-cv-01755-HNJ, at 9 n.1; Doc. 34 in 3:20-cv-00333-HNJ, at 9 n.1).   Moreover, as discussed, Plaintiffs' summary judgment response brief abandons all claims against individual jailers Halcomb and Rutland (not in his capacity as Jail Administrator) for failure to protect, and all claims in these actions for declaratory and injunctive relief.   Those concessions leave only Plaintiffs' § 1983 claims for money damages against Colbert County, Sheriff Williamson, and Jail Administrators Bowling and Rutland for an excessive risk of inmate violence.

4

77,79 in 3:18-cv-01755-HNJ; Docs. 33-34 in 3:20-cv-00333-HNJ), and Defendants filed separate replies in each case. (Doc. 99 in 3:18-cv-01218-HNJ; Doc. 105 in 3:18-cv-01296-HNJ; Doc. 97 in 3:18-cv-01382-HNJ; Doc. 85 in 3:18-cv-01755-HNJ; Doc. 39 in 3:20-cv-00333-HNJ).

As discussed more fully below, the court will deny summary judgment on Defendants Williamson, Rutland, and Bowling's qualified immunity defense to Plaintiffs' claims.    Pursuant to Plaintiffs' contentions, the Colbert County Jail manifested an excessive risk of inmate-on-inmate violence, along with persistent overcrowding; the specific risks posed by capital murder suspects; deficiencies in inmate classification; deficiencies in inmate discipline; and deficiencies in staffing and inmate monitoring.   Plaintiffs also maintain Defendants were deliberately indifferent to these features of the jail, and such conditions, and the indifference thereto, caused the assaults they suffered.

If Sheriff Williamson's and his Jail Administrators' representations bear veracity, they have taken laudable efforts to address an alleged, excessive risk of inmate-on-inmate violence at the Colbert County Jail.   In particular, the Defendants would have commendably accomplished their undertaking while supervising an admittedly overcrowded jail that all stakeholders agree needs replacement, a factor over which Williamson, Rutland, and Bowling have no control.

However, the record evidence yields genuine disputes of material fact whether the Defendants failed to reasonably respond to an alleged, excessive risk of inmate violence of which they were aware. In this posture, the court cannot resolve the disputed issues of fact, as resolution in Plaintiffs' favor could engender a reasonable factfinder at trial to rule in their favor. Therefore, the court will deny the Defendants' motions for summary judgment in these consolidated cases as to Defendants Williamson, Rutland, and Bowling. However, in all other respects, the court will grant Defendants' motions for summary judgment.

## STANDARD OF REVIEW

Pursuant to the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

If the movant sustains its burden, a non-moving party demonstrates a genuine issue of material fact by producing evidence by which a reasonable fact-finder could

6

return a verdict in its favor. *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (citation omitted). The non-movant sustains this burden by demonstrating "that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993). In the alternative, the non-movant may "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." *Id.* at 1116-17; *see also Doe v. Drummond Co.*, 782 F.3d 576, 603-04 (11th Cir. 2015), *cert. denied*, 136 S. Ct. 1168 (2016).

The "court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citations omitted). "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). "Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves*, 530 U.S. at 151 (citation omitted). "That is, the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Id.* (citation omitted).

Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322-23. In addition, a movant may prevail on summary judgment by submitting evidence "*negating* [an] opponent's claim," that is, by producing materials disproving an essential element of a non-movant's claim or defense. *Id.* at 323 (emphasis in original).

There exists no issue for trial unless the nonmoving party submits evidence sufficient to merit a jury verdict in its favor; if the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249. The movant merits summary judgment if the governing law on the claims or defenses commands one reasonable conclusion, *id.* at 250, but the court should deny summary judgment if reasonable jurors "could return a verdict for the nonmoving party." *Id.* at 248. That is, a court should preserve a case for trial if there exists "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249.

## BACKGROUND

The undersigned sets forth the following facts for the summary judgment determination, drawn from the evidence taken in the light most favorable to Plaintiffs.[4]

## I.   The Colbert County Jail

Colbert County constructed its jail in 1962.   (Doc. 85-49, ¶ 4).   The third floor of the jail houses all inmates and contains four, general population cell blocks: Southeast; Northeast; Southwest; and Northwest.   Each cell block contains cells with multiple bunks and a common area, or "bull pen."   Walls separate the cell blocks, such that the inmates in each block do not have contact with inmates in the other blocks. A catwalk area outside the cell blocks allows officers to conduct some monitoring.

---

[4] For efficiency, unless otherwise noted, when citing the record to support the relevant facts, the court will refer only to the evidentiary submissions in the first filed case, 3:18-cv-01218-HNJ.   Defendants' consolidated evidentiary submission in that case is Doc. 85.   That corresponds to Doc. 91 in 3:18-cv-01296-HNJ, Doc. 80 in 3:18-cv-01382-HNJ, Doc. 71 in 3:18-cv-01755-HNJ, and Doc. 30 in 3:20-cv-00333-HNJ.   Plaintiffs' consolidated evidentiary submission in 3:18-cv-01218-HNJ is Doc. 91, which corresponds to Doc. 97 in 3:18-cv-01296-HNJ, Doc. 86 in 3:18-cv-01382-HNJ, Doc. 77 in 3:18-cv-01755, and Doc. 33 in 3:20-cv-00333-HNJ.

For the same reasons, unless otherwise noted, when citing the parties' briefs, the court will refer to briefs in the first filed case, 3:18-cv-01218-HNJ.   Defendants' initial brief in that case is Doc. 88, which corresponds to Doc. 94 in 3:18-cv-01296-HNJ, Doc. 83 in 3:18-cv-01382-HNJ, Doc. 74 in 3:18-cv-01755-HNJ, and Doc. 29 in 3:20-cv-00333-HNJ.   Plaintiffs' response brief is Doc. 93 in 3:18-cv-01218-HNJ, which corresponds to Doc. 99 in 3:18-cv-01296-HNJ, Doc. 88 in 3:18-cv-01382-HNJ, Doc. 79 in 3:18-cv-01755-HNJ, and Doc. 34 in 3:20-cv-00333-HNJ.   Defendants' reply brief is Doc. 99 in 3:18-cv-01218-HNJ, which corresponds to Doc. 105 in 3:18-cv-01296-HNJ, Doc. 97 in 3:18-cv-01382-HNJ, Doc. 85 in 3:18-cv-01755-HNJ, and Docs. 39 & 45 in 3:20-cv-00333-HNJ.   Defendants' opening briefs differ slightly according to the particular facts addressing the Plaintiff in each case, but none of those differences involve any of the cited portions.   Plaintiffs' response briefs and Defendants' reply briefs are the same in each case.

The jail also contains four "J-cells," so called because they previously housed juvenile offenders.  At the time of the relevant events, the J-cells could house four inmates each, and officers used the cells to isolate sex offenders.  (Doc. 85-44, ¶¶ 3-4; Doc. 85-47, ¶¶ 3-4; Doc. 85-49, ¶¶ 4-5; Doc. 85-50, at 2).  Now, officers use the J-cells to house particularly violent or problematic inmates together, as long as those inmates do not face charges in the same criminal case.  (Doc. 85-41, at 20, Doc. 85-43, at 38; Doc. 85-45, at 42, 44).

The jail also contains two temporary holding cells, or "drunk tanks," which could house four inmates each.  Officers designate those cells "DC-1" and "DC-2," and they sometimes use them to isolate inmates for disciplinary reasons because the cells lack privacy and do not contain a television like the general population cell blocks do. Finally, the jail contains a sick bay cell and a separate cell for inmate workers, or "trusties."  (Doc. 85-44, ¶¶ 3-4; Doc. 85-47, ¶¶ 3-4; Doc. 85-49, ¶¶ 4-5; Doc. 85-50, at 2).  However, deposition testimony indicates that the jail primarily used the drunk tanks to detain individuals with mental health issues.  (Doc. 85-41 at 28-29; Doc. 85-48 at 51).

## II.    The May 2016 NIJO Report

Shortly after taking office in January 2015, Sheriff Williamson asked the National Institute of Jail Operations (NIJO) to inspect the jail and provide suggestions for

improvement.   (Doc. 85-49, ¶ 20).   The NIJO inspectors conducted a site visit on March 15-16, 2016, and they issued a report on May 30, 2016.[5]

The report observed the following with regard to inmate management:

> In order to properly manage inmates and ensure the security, safety, order and control of the jail, it is imperative to properly house, classify, discipline and observe the inmates from the moment they enter the jail until the moment they exit the jail.

- On the dates of the inspection process, the jail exceeded designated capacity and inmates were being held in the drunk-tank instead of being housed in cells.   When capacity is exceeded, especially routinely, the jail risks compromising safety, security, order, discipline, ensuring adequate health care, food service, sanitation, exercise, or other essential inmate services . . . .   Additionally, potential inmate-on-inmate violence may occur, which could bring the county into potential liability risks . . . .

. . . .

- Because of the population levels exceeding capacity, the lack of cells and beds available, the types of cells and the available manpower, classification is almost non-existent.   Inmates are housed according to their current charges, medical conditions, etc.

---

[5] The parties had not raised any hearsay issues as to the reliance upon this report as evidence.   To the extent the report garners such a challenge, it may be exempted from the hearsay rule as Sheriff Williamson adopted the statements therein based upon his assertion he implemented its recommendations (*see* Doc. 105 at 13 (citing Doc. 85-61 at 16-22)).   *See* Fed. R. Evid. 801(d)(2)(B) (a statement is not hearsay if it "is offered against an opposing party" and "is one the party manifested that it adopted or believed to be true."); *Pilgrim v. Trs. of Tufts Coll.*, 118 F.3d 864, 870 (1st Cir. 1997) (employer who followed recommendations of grievance committee had adopted committee's report because "adoptive party accepted and acted upon the evidence."); *Wright-Simmons v. City of Oklahoma City*, 155 F.3d 1264, 1268-69 (10th Cir. 1998) (employer who forced employee to resign based on investigative report and attached witness interview notes had adopted report and notes); 5 Weinstein's Federal Evidence § 801.31 (2021) ("A party may adopt a written statement if the party uses the statement or takes action in compliance [with] the statement.") (footnotes omitted).

In addition, the report may meet the business records exception of Federal Rule of Evidence 803(6).

Staff try to consider any known violent tendencies, gang affiliations or conflicts with other inmates, all depending on the available space in each housing area. The inability to properly classify inmates places inmates at risk of being housed with other inmates who may assault or otherwise take advantage of them.

- Inmate discipline is also very difficult to manage as there are no holding cells available for lock down or segregation purposes. While onsite, line level staff admitted the lack of inmate discipline, stating there was nothing they could do because there were little enforceable consequences that matter to the offending inmate who violates rules.

- Most sanctions of the disciplinary system are unavailable to use for correction purposes. Considering the fact that televisions and telephones are located in the cell areas, visitation happens in the hallways with all inmates at once, and recreation yards do not exist, commissary privileges are the only thing which could be taken away from the inmates for disciplinary violations. However, with the lack of classification, this too would be ineffective as commissary could be obtained from other inmates. Because of all of these issues, an effective disciplinary system is not in place. Accordingly, disciplinary hearings, temporary restrictions and administrative segregation are not being utilized.

(Doc. 85-60, at 15-16).

The report also states the following with regard to Inmate Security and Control:

The duty to protect inmates from harming themselves and from being harmed by others must be accomplished while maintaining the legitimate penological interests of the jail including safety and security. This includes facility access, perimeter control, weapon control, key control, tool control, complete supervision and surveillance, staffing, contraband control, searches, use of force, use of restraints and emergency planning. As noted, there were 32 documented use of force incidents in 2015. While there are elements of security in place, the following observations were noted during the inspection presenting significant security and safety risks, many of which are related to insufficient staffing

12

levels, available resources and budget, the physical design of the facility, and limited administrative and staff training.

- Staffing levels are inadequate given the physical layout and population counts at the jail and should be increased. . . .   Due to limited cameras, staffing level shortages and blind spots within the facility, potential inmate on inmate assaults and hostage situations (staff, volunteers and otherwise) could not be addressed and responded to in a timely manner, even if observed or known.   An inmate assault on an officer occurred during the inspection period. It was observed by inspectors at no point during the two days inspection there was adequate staff on any shift to respond to such disturbances or medical emergencies at any time, forcing officers to stand alone, or at best a pair of officers, without readily available backup.   This condition may contribute to the high turnover rate and staff retention challenges.   NIJO advises that Colbert County conduct a thorough staffing analysis including determining whether the current pay scale is comparable to other jails and private sector reemployment opportunities nearby to address staff retention, high turnover and hiring issues facing the administration.

  . . . .

- CCTV is used as a security tool from the control room.   Most cameras appear to function properly and are being heavily utilized by control room staff.   It should be noted that CCTV is not to be used as a replacement to supervision but rather a supplement for staff supervision.   This is important given the number of blind spots observed at the facility.   Also, CCTV does not produce the supervision benefits of smell and sound, for example, which can be observed and responded to by staff.   Inmates in the housing units cannot be observed by the CCTV system.   And if utilized, the toilets are located in the center of the cells in a position where they [can] be constantly observed.

(*Id.* at 19-21).

The report also addressed Living Areas:

13

The Colbert County Jail is aged and outdated in both in [*sic*] physical layout and in technology.   The housing units were not planned adequately to accommodate an increase in population which created a need for increased beds.   This increases the need for necessary inmate support areas, such as kitchen, education and treatment programs, laundry, and religious services.   Inmate movement, especially given the physical constraints and layout of the housing units, increases risk of assaults and escapes and increases the need for additional security staff. . . .

- Due to the inability to appropriately classify inmates being housed in general population, a greater risk of violence to these inmates is created . . . .   The cells lack security measures that should be considered when housing certain classification levels of inmates who should not be placed in a larger dormitory style housing area . . . .

  . . . .

- Staffing deficiencies were identified in the cell areas that pose a potential threat to officer and inmate safety in response to assaults or escapes . . . .

- Segregation cells (J block, Sick Bay, and drunk-tank) are used for housing high profile inmates, suicidal inmates, inmates with medical problems and behavior problems.   While efforts are made to separate the different types of inmates, mixing these inmate types is inevitable due to the lack of showers in the Sick Bay and in the Drunk Tank.   ***During the inspection process, there was an inmate-on-officer assault, resulting from this classification of housing***.   There are very limited segregation cells available to meet the current need for housing inmates that should . . . be isolated due to disciplinary and behavior management issues.   In fact, after this incident, there were no disciplinary measures taken against the inmate.   The lack of administrative segregation space jeopardizes the safety of inmates and officers.   Furthermore, it encourages inmates to continue to disregard jail rules and regulations, knowing there is an unlikely chance of disciplinary movement following behavior that would usually result in disciplinary measures . . . .

14

. . . .

- The need for increased staffing is evident.   Staff reported a lack of confidence and ability in responding to incidents.   No clear plan for back-up was available, especially when only one officer is on duty.

(*Id.* at 33-35) (emphasis in original).

The NIJO recommended immediately hiring six additional corrections officers and implementing a comprehensive training plan.   (*Id.* at 42-45).   It also recommended implementing a disciplinary system and an inmate classification system, with special consideration "given to solve the immediate problems of housing the different classes of inmates safely, particularly those inmates with suicidal ideations, medical needs, [or] who are vulnerable or violent."   (*Id.* at 47).   The NIJO additionally recommended placing a limit "on the number of inmates which can safely and effectively be housed" and developing a plan "to alleviate increased jail population issues until a new jail or additional housing can be arranged.   Options may include early releases, release[] of inmates with minor infractions, contracts with other facilities, cite and release strategies, and book and release options."   (*Id.* at 48).

The report also recommended:

- The housing cells which are currently available should be re-identified and assigned by current needs for the proper classification of inmates. Arrangements for exceeding capacity should be developed and implemented.   There should be protocol for own recognizance releases, good time, cite and release, book and release and day reporting programs.

15

- A plan should be developed and implemented to provide secure and safe showers for inmates housed in the sick bay and in the drunk-tank. The tank should not be considered for long time housing and the time an inmate spends in this type of housing should be limited in duration. These inmates should not be mixed with inmates of a different classification level in order to meet their needs for cleanliness and hygiene.

(Doc. 85-60, at 51).

Rutland did not know about the NIJO report prior to his September 17, 2019, deposition.   (Doc. 85-43, at 113).   The record contains no evidence regarding Bowling's awareness of the report.   Commissioner Jimmy Gardiner testified he did not know about the NIJO report (Doc. 85-54, at 5), and former Commissioner and current County Administrator Roger Creekmore testified he had not seen or read the report. (Doc. 85-56, at 20).   However, former Commissioner David Black did read the report. (Doc. 85-55, at 34).

## III.    Relevant Jail Policies and Procedures

### A.    Responsibility for Operating and Funding the Jail

Colbert County bears responsibility for funding and maintaining the jail, but the Sheriff bears responsibility for the care, custody, and control of inmates.   The Jail Administrator, who reports directly to the Sheriff, bears responsibility for the day-to-day operations of the jail.   DeShannon Bowling served as the Jail Administrator until June 2017, when Marcus Rutland took over that role.   (Doc. 85-49, ¶ 3).

16

## B.    Jail Capacity and Overcrowding

The County constructed the jail to house a maximum of 62 inmates.   However, at the time of the events underlying these lawsuits, the jail regularly exceeded its capacity.   Rutland testified the jail averaged around 100 inmates during the relevant time period.    Sheriff Williamson estimated the average population to equal approximately 80 to 90 inmates, but he acknowledged the population regularly exceeded 100.   (Doc. 85-43, at 84; Doc. 85-48, at 13-14, 41, 46-48; Doc. 85-49, ¶ 4).   In a March 4, 2018, newspaper article, the Sheriff stated the jail "routinely averages from 100 to 125 inmates."   (Doc. 85-55, at 99).   The additional inmates slept on mats on the floors of the cells and bull pens.   (Doc. 85-43, at 84).

To alleviate overcrowding, the Sheriff testified he asks other counties to house inmates, asks judges to release inmates or lower their bonds, and communicates with the local prosecutors and judges regarding sentences in order to reduce the jail population.   (Doc. 85-48, at 13-14, 41, 46-48; Doc. 85-49, ¶ 4).   The Sheriff testified he typically will "start worrying about" taking those measures to reduce the jail population when occupancy reaches 90 or 100 detainees.   (Doc. 85-48, at 51).

Black testified he knew generally about problems with jail overcrowding, although he did not know, at any given time, how many inmates the jail housed. However, he knew that capacity regularly exceeded 100.   (Doc. 85-55, at 28-29).

Creekmore testified he knew the jail was "consistently, significantly over capacity." (Doc. 85-56, at 17).

### C.    Staffing and Inmate Monitoring

During the relevant time period, the Defendants tendered testimony that the Jail Administrator "tried" to schedule two to four officers to work each eight-hour shift, but the record does not contain specific data regarding how many officers actually worked each shift.   One officer always remained on the first floor of the jail, which contained the booking area and jailers' quarters, to monitor the video cameras and answer the phone.   The other officer or officers purportedly roved the cell block areas, performing observation checks every 15 to 20 minutes and noting any problems in a handwritten jail log.   Williamson attested that when he became Sheriff in 2015, he shifted jail dispatch duties to a 911 employee instead of a jail employee, presumably freeing an additional jail officer for inmate monitoring duties. (Doc. 85-49, ¶ 6; *see also* Doc. 85-44, ¶ 6; Doc. 85-46, ¶ 6; Doc. 85-47, ¶ 6).

Jail logs consistently portrayed two, and sometimes three, officers working on shifts during the time period at issue.   (*See* Doc. 91-1 at 3-17; 91-2 at 3-7, 13-14; 91-3; 91-4; 91-5; 91-6; 91-7).   Furthermore, the logs depict officers performed varying tasks while on duty other than roving and monitoring, such as "pulling" laundry and trash; retrieving ice and mop buckets; preparing and distributing "chow"; and transporting

inmates around the facility for various reasons, such as washing cars, sick bay, etc.   (*See, e.g.*, Doc. 91-3).

Video cameras in the catwalk areas outside the cell blocks allowed officers to view cell doors, but officers could not see inside cells, other than a very limited space just inside the cell door.   The jail also employed an audio monitoring system that allowed the officer in the booking area to communicate with the officers roving the jail and to listen to activity in the cell blocks.   In addition, roving officers carried communication radios.   (Doc. 85-49, ¶ 6; *see also* Doc. 85-44, ¶ 6; Doc. 85-46, ¶ 6; Doc. 85-47, ¶ 6; Doc. 85-43, at 39-40; Doc. 85-45, at 34; Doc. 85-48, at 16).

In response to the May 2016 NIJO report, the Sheriff testified he installed "a new CCTV system in the control room of the jail."   (Doc. 85-49, ¶ 20).   He explored replacing all the security cameras in the facility, but he received a quote of $50,000 to perform the work, and he declined to spend that money.   He believed adding additional cameras in or just outside the cells could prove futile because the low height of the ceilings would prevent officers from installing cameras out of inmates' reach, and inmates likely would destroy or impede the cameras.   (Doc. 85-48, at 18, 36-37; *see also* 85-43, at 39-40).

The Sheriff also testified he "[i]ncreased staffing and salaries for corrections officers" and "[i]ncreased supervision of line staff at the Jail."   (Doc. 85-49, ¶ 20).   The County's budget report reflects an approximately $100,000 increase in total salaries

19

between 2015 and 2016, and another similar increase between 2017 and 2018.   (Doc. 85-58, at 2).[6]  The record does not indicate exactly how much existing jailers' salaries increased, or the exact number of additional jailers the Sheriff hired.   However, the budget numbers do not reasonably indicate the Sheriff hired six additional jailers during the time period Plaintiffs were detained at the facility, as the NIJO report recommended.

In addition, Sheriff Williamson acknowledged that the physical layout of the jail limited officers' abilities to observe inmates, even after implementing staffing improvements.   (Doc. 85-48, at 31).   Commissioner Black testified he did not know whether the jail had the ability to monitor inmates in isolation cells with cameras. (Doc. 85-55, at 30).

Defendants declare that officers "routinely" perform cell inspections, or "shakedowns," to search for contraband.   They also state officers perform daily head counts, during which they view each inmate to verify his presence in the jail and to detect any illnesses or injuries.   (Doc. 85-44, ¶ 13; Doc. 85-47, ¶ 13).

---

[6] Plaintiffs assert that "salaries budget numbers for 2016 and 2[01]7 were, in fact, less than 2015." (Doc. 93, at 24).   Indeed, the budget report line item amounts for "Salaries & Benefits" in 2016 and 2017 decreased from the 2015 amounts.   However, the report explains that "mid 2015 E911 took over dispatch so salaries would have decreased and dispatch services would have increased.   So to get total salaries & benefits, we really need to add salaries + dispatch srv line item."   (Doc. 85-58, at 2). The totals for "Salaries & Benefits" and "Dispatch Srv" increased between 2015 and 2016, and they increased again between 2017 and 2018.   Thus, the record does not support Plaintiffs' assertion that officer salaries decreased over time.

### D.    Officer Training

Sheriff Williamson attested on January 29, 2021, that he implemented additional training measures in response to the May 2016 NIJO report, including requiring the Jail Administrator and other officers to attend NIJO training classes, providing two hours of weekly training for each officer, and requiring all new officers to attend the Alabama Jail training academy.   (Doc. 85-49, ¶ 20).   However, he testified during his September 17, 2020, deposition that the Jail Administrator receives formal training in statewide classes, but the other officers do not receive any formal training.   Rather, he stated existing officers learn from the Jail Administrator, and new officers receive on-the-job training from more senior officers.   (Doc. 85-48, at 25-26).   Corrections Officer Heath Halcomb testified on September 24, 2019, that he had not received any training in the previous eight years.   (Doc. 85-41, at 25).

### E.    Classification and Inmate Safety

Rutland testified the jail did not have a "formal classification system."   (Doc. 85-43, at 36).   Nevertheless, an undated Colbert County Jail Policy and Procedure Directives state the following regarding Enemies Lists:

> Policy:
>
> It is the policy of the Colbert County Jail that insofar as possible, the person will [not[7]] be placed in the same housing unit with others who might do him/her harm because of [a] pre-existing problem.

---

[7] The written policy omits the word "not," but the court considers that a typographical error, as the

Procedure:

All persons booked into the Colbert County Jail will be given the opportunity to complete an enemies list.

The person being booked into the jail can list any other persons in the jail whom he fears or has reason to believe is [*sic*] a threat to him.

If the inmate states that there is another inmate(s) who might do him harm, jail personnel will document the concern of the inmate and will house the inmate away from the one(s) he/she fears.

If a new inmate states that he/she has no knowledge of another inmate who might want to harm him/her, the booking officer will document this information on the enemies list, have the inmate sign the form, and place the form in the inmate's file.

(Doc. 85-51, at 7-8).

The Policy and Procedure Directives state the following regarding Classification of Inmates:

Policy:

It is the policy of the Colbert County Jail that an inmate will be assigned to the housing unit of the jail most appropriate for his/her security and safety.

Procedure:

The Jail Administrator will devise classification criteria for the jail based on the recognition that the following classes of persons should not be housed in the same housing units:

- male and female

---

policy otherwise would present obvious problems that Plaintiffs have not identified.

- adult and juvenile
- pre-trial and sentenced (space permitting)
- misdemeanor and felon (space permitting).

(*Id.* at 9).   The written policy does not mention segregating inmates charged with violent offenses from those charged with non-violent offenses.

Sheriff Williamson, Jail Administrators Rutland and Bowling, and corrections officer Michael Williams also offered testimony about the practices at the jail.   When officers book a new inmate, they ask if the inmate has any known enemies at the jail. If the inmate responds affirmatively, officers note the response in a written file and in the Jail Tracker software system, and they do not assign the new inmate to the same cell block as the known enemy.   After booking, officers escort a new inmate to his assigned cell block and read a list of all other inmates housed there.   If the inmate expresses that one of those other inmates constitutes an enemy, or that he fears for his safety because of the other occupants, officers reassign him to a different cell block.   (Doc. 85-41, at 27; Doc. 85-44, ¶ 8; Doc. 85-46, ¶ 7; Doc. 85-47, ¶ 8; Doc. 85-48, at 11; Doc. 85-49, ¶ 9).   Rutland, Bowling, and Williams stated officers house inmates "the best we can according to the way they are charged, and by looking at criminal histories."   (Doc. 85-44, ¶ 8; Doc. 85-46, ¶ 7; Doc. 85-47, ¶ 8).   They expressed the goals of housing "inmates with violent charges separately from those with nonviolent charges, and [protecting] inmates from being exposed to unnecessary risks from other inmates." (*Id.*).   However, Williams acknowledged during his September 2019 deposition that

23

officers "did not do a very good job of [segregating violent and non-violent inmates] in the past," though he testified officers are improving those conditions with their current policies.   (Doc. 85-45, at 49).

If a safety concern arises due to a conflict with a cell mate during incarceration, an inmate can report the concern to officers verbally or through an e-mail kiosk located in the cell block, and the officers will move him to a different cell block.   Jail Tracker also monitors and maintains these requests, noting which inmates officers should house separately.   (Doc. 85-49, ¶ 9; *see also* Doc. 85-41, at 27; Doc. 85-48, at 11-12).

Due to the small size of the Colbert County Jail, "officers typically know the people that come in and out of the Jail."   (Doc. 85-49, ¶ 11).   The Sheriff testified that knowledge allows officers to "separate those inmates with serious or violent charges or violent natures/actions from those inmates with nonviolent charges, and house them in different areas of the Jail."   (*Id.*; *see also* Doc. 85-46, ¶¶ 2-3).   It also allows officers to identify conflicts between inmates and separate the conflicting parties.   Sheriff Williamson testified that officers always check before moving an inmate into a new cell block to ensure that the inmate does not have any known enemies in that block.   (Doc. 85-49, ¶ 11).

Even though Rutland testified that in August 2017 the jail commenced a policy of placing detainees accused of murder in J-cells (Doc. 85-43 at 38), the small size of the jail limited officers' ability to segregate inmates.   (Doc. 85-48, at 13 ("We – you

24

know, you can only put them so many places in our jail.   So, you know, if you – if you get – we don't have enough room to classify – put each classification in a different room, you know.   There's no way to do that.")).   Sheriff Williamson testified that the jail's limited space prevented him from establishing a more formal inmate classification system.   (Doc. 85-48 at 35).   Consequently, inmates charged with violent offenses would occupy the same cell block as inmates charged with non-violent offenses.   (Doc. 85-48, at 11; *see also* Doc. 85-43, at 32).   As discussed, officers now attempt to place violent inmates together in a J-cell, as long as the inmates do not face charges in the same criminal case.   (Doc. 85-41, at 20, Doc. 85-43, at 38; Doc. 85-45, at 42, 44).

## F.   Disciplining Inmates Who Participate in Assaults

The Defendants attest the jail maintained a policy and practice of disciplining inmates who acted as the aggressors in assaults on other inmates, if witnesses or other evidence corroborated the aggression.   They also declare that officers typically housed inmates who incurred disciplinary infractions in one of the drunk tank cells, where they would experience isolation and lose television privileges.   The Defendants also assert they sometimes revoked an inmate's telephone, commissary, and visitation privileges. (Doc. 85-44, ¶ 12; Doc. 85-47, ¶ 12; Doc. 85-49, ¶ 14).   However, the small size of the jail limited officers' ability to inflict effective discipline because they cannot always isolate inmates with disciplinary infractions, and inmates can find other ways to access the telephones and commissary.   (Doc. 85-48, at 31-32, 35).

25

Commissioner Gardiner testified he did not know the jail lacked isolation cells, or that isolating an inmate in a J-Cell would eliminate that cell's availability for other inmates.  (Doc. 85-54, at 6 ("I was not aware that – that there were[,] weren't any isolation cells.   I – I didn't know you had to shut off three more cells.   I – I was – I've seen where there's people been in isolation, but I assumed there was a one cell.   I didn't pick up that they cut off other people, you know.").   Commissioner Black also testified he did not know whether the jail contained isolation cells, or whether the lack of isolation cells presented a problem.  (Doc. 85-55, at 32, 46).   Black acknowledged that segregating a single inmate in a four-person cell would prevent the jail from using all available beds, but he never became involved in any decisions regarding inmate segregation as that would fall under the Sheriff's purview.  (*Id.* at 43).   Commissioner Creekmore testified he knew the jail did not have individual isolation cells, but he did not know the extent to which the lack of isolation cells impacted the Sheriff's ability to separate inmates, as he was "not in charge of jail operations."  (Doc. 85-56, at 7).   The Sheriff had mentioned "offhanded" to Creekmore that "he could use more isolation cells," but that "was not an in-depth conversation."  (*Id.* at 6).

## IV.  The Jail's Requirement to House Five Capital Murder Pretrial Detainees

Between 2016 and 2018, the Colbert County Jail housed five pretrial detainees facing capital murder charges for the same murder:  Peter Capote; Benjamin Young; Thomas Hubbard; DeVontae Bates; and Riley Hamm, Jr.  The jail had never before

26

housed that many capital murder detainees at once.   (Doc. 85-44, ¶ 8; Doc. 85-46, ¶ 7;

Doc. 85-47, ¶ 8; Doc. 85-49, ¶ 12).

Investigators asked jail officials to keep the detainees separated from each other

for security reasons and to prevent them from communicating with each other in the

jail and potentially compromising the prosecution.   To accommodate that request, jail

officials attempted to secure housing for the detainees in other facilities, but could only

make such an arrangement for Bates and Hamm, as no other facility would agree to

house Capote, Young, or Hubbard.   (Doc. 85-44, ¶ 9; Doc. 85-47, ¶ 9; Doc. 85-49, ¶

12).

Williamson, Rutland, and Bowling all attested that they chose to separate Capote

and Young because those two inmates did not get along.   (Doc. 85-44, ¶ 9; Doc. 85-

47, ¶ 9; Doc. 85-49, ¶ 12).   However, the Jail Tracker Offender Alerts for Capote and

Young do not list each other among the names of inmates officers needed to house

separately.   (Doc. 85-10, at 2; Doc. 85-13, at 2).   Officers placed Young alone in one

of the J-cells because he acted as a leader of the group of capital murder detainees,

talked often about violence, and possessed a physically imposing frame.   They placed

Capote and Hubbard in general population cells.   Capote also acted as a leader of the

group, but he possessed a smaller frame than Young, so officers chose to prioritize

isolating Young over isolating Capote.   After initially assigning Capote and Hubbard

to their cell blocks, Defendants declare they frequently moved them around if they

27

experienced conflicts with other inmates.   Officers documented any cell block reassignments in the Jail Tracker software, and they checked for known enemies before effecting a reassignment.   (Doc. 85-44, ¶ 9; Doc. 85-47, ¶ 9; Doc. 85-49, ¶ 12).

On March 5, 2016, upon Capote's arrival at the Colbert County Jail, officers assigned him to the Northwest cell block.   At some unspecified point, Capote occupied one of the drunk tank cells, and on October 10, 2016, officers transferred him to the Northwest cell block.   On December 7, 2016, they transferred him back to the Southwest cell block.   At some unspecified point, they transferred him to the Southeast cell block, and on July 19, 2017, they transferred him to a drunk tank cell.   At some unspecified point, officers transferred Capote back to the Southeast cell block, and on September 6, 2017, they moved him to the Northwest cell block, then to a drunk tank cell.   (Doc. 85-43, at 258).   The record does not depict Capote's cell movement after September 6, 2017, but officers must have reassigned him to the Southeast cell block at some point, because, as later discussed, he perpetrated James's and Hargrove's assaults in that cell block in March and April of 2018.   In any event, Rutland conceded that Capote was a "cell boss," which means he ran the cell block where he was located and typically retained power to administer violence with assistance, just "not all the time." (Doc. 85-43 at 32).

Upon Young's arrival at the Colbert County Jail, officers assigned him to the Southeast cell block.   On September 22, 2016, they moved him to a drunk tank cell,

Case 3:18-cv-01755-HNJ   Document 91   Filed 09/30/21   Page 29 of 124

and on October 10, 2016, they transferred him to one of the J-cells for "Protective Custody" because another inmate hit him and knocked him unconscious.   On June 20, 2017, they moved him from the J-cell to the Northeast cell block.   At some unspecified point, he returned to a J-cell, and on August 8, 2017, officers transferred him back to the Northeast cell block.   On September 12, 2017, they moved him to the Northwest cell block.   (*Id.* at 257; Doc. 85-45, at 13-15).

Officers avoided assigning Capote and Young to the same cell block as inmates Alton Davis and Markease Jones, who jailer Michael Williams described as even more dangerous than Capote or Young.   (Doc. 85-45, at 39).[8]   Officers believed the victim in Young and Capote's case may be a relative of Davis or Jones, thereby providing a potential source of conflict and violence.   (*Id.* at 39-40, 42, 51).   However, the Jail Tracker Offender Alerts for Capote and Young do not list Davis and Jones among the names of inmates officers needed to house separately.   (Doc. 85-10, at 2; Doc. 85-13, at 2).

Sheriff Williamson attested that locking Capote and each of the other capital murder detainees alone in one of the J-cells or in a bunk room would not have constituted a reasonable housing solution:

---

[8] Davis eventually received a 99-year prison sentence for shooting a police officer, and he often experienced conflicts with other inmates in the Northeast cell block.   Williams described Jones, who eventually received a 25-year prison sentence for kidnapping, theft, and burglary, as "very intimidating" and "one that you did not mess with."   (Doc. 85-45, at 39).

This would have caused the Jail to have less beds available for its inmates, and cause more overcrowding, which could have caused even more problems, including problems with security and safety in the Jail.   More importantly, these five detainees charged with capital murder were pretrial detainees who cannot be punished prior to an adjudication of guilt.   In my opinion, locking them up in isolation for an extended period of time would have possibly violated their constitutional rights.   Our plan of dealing with the unique situation that we encountered in the Jail was to use all of the beds we could for inmates, do our best to separate inmates with nonviolent charges and those with violent charges, monitor inmates and their enemies in the jail and keep them separate, and move inmates if there was a problem between them in the cellblocks.

(Doc. 85-49, ¶ 14).

Rutland and Bowling stated that officers

would have liked to have been able to put [the capital murder] detainees in their own separate cells, isolated from each other in different parts of the jail to completely limit communication between them, but we were limited in what we could do because we simply did not have single isolation cells in the jail.

(Doc. 85-44, ¶ 9; Doc. 85-47, ¶ 9).

Rutland acknowledged that placing Capote in a J-cell "with two or three other people that [officers] knew were not going to be vulnerable to him" would have constituted "the reasonable thing to have been done as a matter of jail management." (Doc. 91-43, at 33).   However, Rutland and Bowling stated that officers chose not to house Capote in one of the J-cells because they wanted to maintain his separation from Young, who already inhabited one of the J-cells, and because sex offenders also inhabited some of the J-cells.   The record does not contain any evidence regarding how

many sex offenders the Colbert County Jail housed during the relevant time period. (Doc. 85-43, at 38-39; Doc. 85-44, ¶ 11; Doc. 85-47, ¶ 11).

Rutland and Bowling also opined that placing Capote in one of the bunk cells and locking the door to keep him away from other inmates would not have constituted a reasonable option because it would have caused the loss of more available beds in an already overcrowded jail.   In addition, during the relevant time period, officers "did not lock down the sleeping/bunk cells because at one point the rolling doors to these cells became very hard to unlock, making it a safety hazard to keep them locked with an inmate inside."  (Doc. 85-44, ¶ 11; Doc. 85-47, ¶ 11).   However, jail logs reflect that officers locked two inmates in a bunk cell for disciplinary isolation as recently as March 2, 2017.   (Doc. 85-43, at 78-79).   Maintenance repaired the doors at some unspecified point, at the officers' request.   (Doc. 85-44, ¶ 11; Doc. 85-47, ¶ 11).

## V.    The Assaults on Plaintiffs

### A.    Christopher Ogletree

Officers booked Plaintiff Christopher Ogletree into the Colbert County Jail on August 6, 2016, on charges of failure to pay a speeding ticket.   (Doc. 85-1, at 7; Doc. 85-2, at 2).   Ogletree could not recall with certainty whether the booking officers asked him if he had any enemies in the jail, but he "want[s] to say they did."  (Doc. 85-1, at 8).   Officers assigned him to a cell within the Southeast cell block, where he kept to himself and did not experience any problems with any other inmates at first.   Over

time, Ogletree sensed some tension with a cellmate named James Gadbaw and nicknamed "Mississippi," who faced charges of theft and robbery. Gadbaw spoke loudly and hatefully to Ogletree, and he bumped into Ogletree when they crossed paths. Ogletree offered Gadbaw some snacks in an attempt to ease the tension, but he never complained to a corrections officer that he feared Gadbaw or any other inmate. (*Id.* at 9-10, 22; Doc. 85-4, at 3-11).

On August 10, 2016, Ogletree observed Gadbaw talking to another inmate he called "B.K.," also known as Benjamin Young, and the conversation made him feel uncomfortable. Ogletree sat down in the common area of the cell block. Gadbaw walked by and hit Ogletree once in the left side of the mouth, breaking his jaw and necessitating facial surgery. (Doc. 85-1, at 9-11, 24; Doc. 85-7, at 5; Doc. 85-45, at 18).

Officers recorded Ogletree's assault in incident reports. (Doc. 85-2, at 3-4). They also added a notation to Ogletree's file that he should be separated from Gadbaw during any future incarcerations. (Doc. 85-3, at 2). Jail logs from August 10, 2016, contain notations from only one officer ("CO 63"), giving rise to the reasonable inference that only one officer worked the shift on which Gadbaw attacked Ogletree. (Doc. 85-2, at 5-6).

### B.    Terry Alexander

Officers booked Plaintiff Terry Alexander into the Colbert County Jail on July 13, 2016, on charges of possession of heroin and Tramadol, and they assigned him to

the Northwest cell block.   (Doc. 85-8, at 43).   On October 24, 2016, Alexander sat on a bench in the cell block's common area, watching television.   He watched an inmate named Pruitt Terry walk to the commissary machine, then he turned his attention back to the television.   He then felt blows to his ear and the side of his head.   He jumped up and saw inmates Drew Singleton and Peter Capote standing next to him.   Pruitt Terry yelled, "Get him!" and the three afore-mentioned detainees hit and kicked Alexander and stomped his head.   After the assault, the other men shoved Alexander under a bunk and took all of his personal items.   (*Id.* at 26-27).

Capote faced capital murder, assault, and weapons discharge charges; Pruitt Terry faced domestic violence strangulation charges; and Drew Singleton faced theft charges.   (Doc. 85-9, at 5, 7; Doc. 85-16, at 2-4; Doc. 85-18, at 17, 19, 25, 32-34).   Capote had shared the Northwest cell block with Alexander since the beginning of Alexander's incarceration in July, and the two never experienced any conflicts prior to October 24.   (Doc. 85-8, at 27, 43).   Terry arrived to the Northwest cell block approximately two weeks prior to the assault, and Singleton arrived approximately two months prior to the assault.   Alexander did not experience any previous conflicts with Terry or Singleton.   He did not express to any corrections officer that he feared Capote, Terry, or Singleton.   (*Id.* at 28, 43-45).

Alexander's uncle worked as an investigator for the Sheriff's Department, and he served as the lead investigator on Capote's murder case.   Capote knew Alexander's

33

uncle worked as a Sheriff's deputy, but Alexander did not know definitively whether Capote knew the uncle worked Capote's case.   Alexander informed his booking officers about his uncle's position as a Sheriff's deputy, but he did not ask for a housing assignment away from individuals whose cases his uncle may have investigated.   (*Id.* at 54-56).

As a result of the assault, Alexander defecated himself.   (Doc. 85-8, at 28).   He could not recall whether he lost consciousness, but he suffered broken ribs, a cracked sternum, and a brain hemorrhage that required surgery.   He later contracted pneumonia, and he continues to suffer from post-traumatic stress disorder (PTSD), short-term memory loss, and headaches.   (*Id.* at 8, 14, 26, 31, 33-35, 47; Doc. 85-21, at 7, 10-14).   The assault also left him with a permanent indentation on the left side of his head.   (Doc. 85-8, at 49).

Alexander did not at first identify his assailants because he feared they would retaliate against him and hurt him even more.   Rather, he told jailers that he had fallen in the shower.   However, he later disclosed the assailants' identities to the officer who guarded him in the hospital. (*Id.* at 26, 45).   Officers reported Alexander's assault in an incident report and in jail logs.   (Doc. 85-19, at 2-4).   Jail logs from October 24, 2016, contain notations from two officers ("CO 54" and "CO 58"), giving rise to the reasonable inference that two officers worked the shift on which Alexander suffered the assault.   (*Id.* at 3-4)

34

## C.    William Kryston

Officers booked Plaintiff William Kryston into the Colbert County Jail at approximately 4:30 a.m. on June 19, 2017, on charges of eluding the police, and they assigned him to the Southeast cell block.   (Doc. 85-23, at 13-14).

Kryston previously served seven months in the Colbert County Jail, ending on March 22, 2017, on charges of unlawful possession of a controlled substance.   (Doc. 85-24, at 4-5).   He knew about Capote and the other capital murder detainees, but he never had contact with any of those inmates during his previous incarceration because they resided in a different cell block.   (Doc. 85-23, at 9-10).

When Kryston entered the Southeast cell block, he approached the first bunk room, which remained dark due to the early hour and the fact that most inmates continued to sleep, to ask if it contained any open bunks.   An unknown inmate asked Kryston's name, which he gave, and the inmate said he and others would clean off an open bunk for Kryston.   Kryston walked into the common area to wait. Approximately ten minutes later, Capote and another inmate named Tyler Butler[9] told Kryston he could claim the clean bunk.   However, as soon as Kryston lifted his mattress up onto the bunk, Capote and Butler hit, kicked, and stomped on him in the

---

[9] Butler's full name is Christopher Tyler Butler.   Doc. 85-26, at 2-6.   The record depicts that officers and inmates called him both "Christopher" and "Tyler," and that both names refer to the same individual.

face, head, chest, and back.   Kryston had never encountered either Capote or Butler before that day.   (*Id.* at 13-15).   Butler faced charges of unlawfully possessing marijuana.   (Doc. 85-26, at 2-6).

As a result of the assault, Kryston suffered fractured ribs and a punctured lung that required insertion of a chest tube.   (Doc. 85-23, at 24).

Officers reported Kryston's assault in an incident report and jail logs.   (Doc. 85-24, at 2-3, 6-12).   The incident report noted that Capote stated he assaulted Kryston because Kryston robbed one of Capote's family members a few months earlier.   It also stated that Capote asked officers to remove Kryston from his vicinity before he hurt Kryston even worse.   (*Id.* at 2-3).   Officers added a notation to Kryston's file that he should be separated from Capote during any future incarcerations.   (Doc. 85-25, at 2).   Available jail logs from the morning of June 19, 2017, state that one officer left duty after Kryston's attack, but they do not state how many officers were on duty at the time. (Doc. 85-24, at 6).

### D.   Timmie James

Officers booked Plaintiff Timmie James into the Colbert County Jail on December 27, 2017, on charges of unlawfully breaking and entering a vehicle, bond revocation, theft, attempted burglary, illegally obtaining water/electronic/gas, unlawful possession of a controlled substance, and theft of services.   (Doc. 85-29, at 2).   They assigned James to the Southeast cell block.   (*Id.* at 5).

On March 11, 2018, five other inmates, including Capote, assaulted James, resulting in a nasal fracture and contusions to his head, face, and chest.   (*Id.*; Doc. 40-1 in 3:20-cv-00333-HNJ, ¶ 2; Doc. 85-32, at 4).[10]   Officers documented James's assault in the jail logs, and they added a notation to James's file that he should be separated from Capote during any future incarcerations.   (Doc. 85-29, at 5; Doc. 85-30, at 2). Jail logs from the relevant hours of March 11, 2018, state two officers ("CO 54" and "CO 61") worked the shift during which James's assault occurred.   Depending on the exact timing of James's assault, an additional officer may have worked the shift, as the logs indicate that "CO 65" left his shift at 5:00 p.m. (Doc. 85-29, at 4-5).

## E.   Daniel Hargrove

Officers booked Plaintiff Daniel Hargrove into the Colbert County Jail on April 11, 2018, as a fugitive from justice with charges of making a terrorist threat to a Rockdale, Georgia, police department, and they assigned him to the Southeast cell block.   (Doc. 85-33, at 8, 10-11; Doc. 85-34, at 2).   For approximately one week, Hargrove did not experience any altercations or conflicts with Capote or any other inmates.   On April 18, Capote physically assaulted Hargrove, resulting in three broken ribs, a broken jaw and nose, and a swollen eye.   (Doc. 85-33, at 12-13; Doc. 85-36, at

---

[10] Sheriff Williamson and Jail Administrator Rutland state they had no knowledge of James's assault, and jail records do not include a reference regarding the assault.   (Doc. 44-1 in 3:20-cv-00333-HNJ, ¶ 2; Doc. 44-2 in 3:20-cv-00333-HNJ, ¶ 2).   But the court must accept James's statements as true for purposes of ruling on the motions for summary judgment, and James declared that Capote and four other inmates assaulted him.

5-8, 11).   After the assault, Hargrove experienced disorientation, as he believed he was in a place other than the jail.   (Doc. 85-33, at 12-14, 27).

Officers documented Hargrove's assault in an incident report and in the jail logs. (Doc. 85-34, at 9-14).   Prior to the assault, Hargrove never informed corrections officers that he feared for his safety.   (Doc. 85-46, ¶ 9).   Jail logs from the relevant hours of April 18, 2018, state two officers ("CO 64" and "CO 66") worked the shift during which Hargrove's assault occurred.   (Doc. 85-34, at 10-11).

## VI.   Capote's History of Violence Toward Other Inmates

Even though no jury had yet convicted the capital murder detainees while they inhabited the Colbert County Jail, Sheriff Williamson and Jail Administrator Rutland knew Capote exhibited a violent background due to his criminal history, gang affiliation, and teardrop tattoos, which typically signify past violent acts. (Doc. 85-43, at 32-33; Doc. 85-48, at 19-20).   Officers testified Capote behaved respectfully toward jail staff, and Sheriff Williamson testified Capote "typically got along with other inmates for the most part."   (Doc. 85-49, ¶ 13; *see also* Doc. 85-44, ¶ 10; Doc. 85-47, ¶ 10 ("Capote usually got along with the inmates.   We were never notified by inmates that Capote was generally violent toward them.")).   Nevertheless, as revealed previously Rutland conceded that Capote was a "cell boss," which means he ran the cell block where he was located and typically retained power to administer violence with assistance, just "not all the time."   (Doc. 85-43 at 32).

38

The Sheriff testified he did not know of any assaults involving Capote until October 24, 2016, when Capote assaulted Alexander, and the record contains no evidence of any such assaults.   (Doc. 85-49, ¶ 13).   Prior to that date, there exists evidence of one inmate injury and two inmate assaults in Capote's cell block, as well as two requests to remove inmates from the cell block for their safety.   (Doc. 91-1, at 7, 11-12; Doc. 91-2, at 1; Doc. 85-43, at 45, 58; Doc. 85-45, at 21-24, 26-27, 31).

On November 9, 2016, and January 17, 2017, inmate assaults occurred in Capote's cell block.   (Doc. 85-45, at 31-32; Doc. 91-2, at 1-4).   On January 25, 2017, officers removed an inmate from Capote's cell block because Capote said he wanted to fight the inmate.   (Doc. 91-2, at 5; Doc. 85-45, at 36).   On February 12, 2017, a physical altercation occurred between Capote and another inmate.   After the incident, officers removed the other inmate from Capote's cell block.   (Doc. 91-2, at 6; Doc. 85-45, at 37).   On March 13, 2017, Capote assaulted another inmate in his cell block by hitting him four times in the left jaw and stomping him four times in the head, resulting in injuries that required emergency room treatment.   In response, officers locked Capote in his cell for 14 days with Butler, an "associate" of his. (Doc. 91-2, at 7; Doc. 85-45, at 54).[11]   On April 18, 2017, Capote attempted to charge at an inmate worker,

---

[11] The record does not clearly explain why officers disciplined both Capote and Butler, as the jail logs reflect that Capote, not Butler, perpetrated the assault.   (Doc. 91-2, at 7).

but officers restrained him, and the officers witnessed no physical altercation.   (Doc. 91-4, at 10).

On June 19, 2017, the assault on Kryston occurred. (Doc. 85-23, at 13-15).

On July 11, 2017, an inmate in Capote's cell block suffered an assault that required an emergency room visit.   (Doc. 91-4, at 20).   On July 19, 2017, Capote fought with another inmate, and officers moved that inmate to a drunk tank cell.   (Doc. 91-5, at 2).   On August 14, 2017, an inmate informed officers that Capote had fashioned a shank from a metal pole and threatened to stab people.   (*Id.* at 7).   On August 15, 2017, Capote charged at an inmate worker, who then punched Capote. (Doc. 91-2, at 11; 91-5, at 7; Doc. 85-45, at 58).

On September 5, 2017, an inmate asked to be removed from Capote's cell block "because of problems."   (Doc. 91-2, at 12).   This request angered Capote and Butler, and Butler assaulted the inmate who made the request.   As a result of this incident, officers moved the assault victim to a J-cell, Butler to a different cell block, and Capote to one of the drunk tank cells.   The incident report states:   "Several prior assault incidents have involved inmates Tyler Butler and Peter Capote so they were moved and split up."   (*Id.*; *see also* Doc. 91-5, at 16).

On September 7, 2017, an assault occurred in the drunk tank cell that housed Capote, but the evidence does not state whether Capote participated in the assault.

40

(Doc. 91-5, at 17).   On March 3, 2018, Capote and three other detainees assaulted a fellow inmate they suspected of stealing.   (Doc. 91-6, at 11; Doc. 85-43, at 103-04).

On March 11, 2018, the assault on James occurred.   On April 18, 2018, the assault on Hargrove occurred.

Thus, jail records reflect that Capote participated in ten documented assaults during his approximately 800-day incarceration.   (Doc. 85-49, ¶ 13).   Officers "never had advance notice" of any specific assault involving Capote.   (Doc. 85-44, ¶ 10; Doc. 85-47, ¶ 10).   When Capote participated in an assault, officers allegedly inflicted what Sheriff Williamson characterized as "appropriate discipline" and separated Capote from the other inmates involved in the fight.   (Doc. 85-49, ¶ 14).   Capote spent a total of 20 days in drunk tank cells as discipline for two separate incidents.   (Doc. 85-44, ¶ 10; Doc. 85-47, ¶ 11; Doc. 85-11, at 2).

## VII.   Young's History of Violence Toward Other Inmates

Two inmate assaults occurred in the Southeast cell block where Young resided, prior to the first assault alleged in this case on August 10, 2016.   However, the records do not reflect that Young instigated or participated in those assaults.   (Doc. 91-3, at 4, 7).   Immediately prior to Ogletree's August 10, 2016, assault, Ogletree observed James Gadbow, his assailant, talking to Young.   (Doc. 85-1, at 9-10, 23; Doc. 85-45, at 18 (explaining that others called Young "B.K.")).   On September 6, 2016, Gadbow assaulted another inmate.   Later that day, Young told officers "*they* would keep beating

up people until [officers] brought back Kasey Richard." (Doc. 91-1, at 10; Doc. 85-45, at 10) (emphasis supplied).[12]

On May 24, 2017, Young assaulted an inmate worker who brought supplies to his J-cell. (Doc. 85-45, at 17-18). On June 20, 2017, the same day he returned to general population after isolating in a J-cell, Young assaulted an inmate. (Doc. 91-4, at 17). On July 25, 2017, Young assaulted another inmate, causing that inmate to need emergency room treatment. (Doc. 91-5, at 4). On December 6, 2017, Young assaulted an inmate, but neither party received notable injuries. (Doc. 91-6, at 5). On December 10, 2017, and January 7, 2018, assaults occurred in Young's cell block, but the record does not contain evidence directly connecting Young to the assaults. (Doc. 91-6, at 6, 9-10).

## VIII.  Other Assaults at the Jail

In addition to the incidents already described, officers documented 13 inmate assaults in the Jail Tracker system between March 3, 2017, and April 18, 2018. None of these assaults ostensibly involved any of the Plaintiffs or any of the capital murder detainees. (Doc. 85-41, at 58 (March 3, 2017), 60 (April 18, 2017), 61 (May 16, 2017), 62-63 (May 21, 2017), 65 (May 28, 2017), 69 (July 13, 2017), 74 (September 8, 2017), 75 (September 15, 2017), 77 (September 25, 2017), 80 (November 26, 2017). Two of

---

[12] The record contains no additional evidence regarding Kasey Richard or the reasons why Young wanted officers to bring Richard back to the cell.

those assaults resulted in officers transporting an involved inmate to the emergency room for additional medical treatment.   (*Id.* at 58, 77).[13]

Handwritten jail logs document 52 additional inmate assaults between approximately May 2016 and September 2018.   (Doc. 91-3, at 1 (undated), 2 (undated), 4 (May 16, 2016); Doc. 91-1, at 11 (June 13, 2016); Doc. 91-3, at 7 (June 29, 2016), 8 (September 26, 2016), 9 (October 23, 2016), 10 (October 28, 2016), 11 (November 3, 2016), 12 (November 13, 2016), 13 (undated), 14 (November 25, 2016), 15 (November 26, 2016), 16 (undated), 17 (December 22, 2016), 18 (undated), 19 (January 5, 2017), 20 (January 13, 2017); Doc. 91-4, at 1-2 (January 17, 2017), 3 (January 23, 2017), 5 (undated), 7 (undated), 8-9 (April 4, 2017), 11-12 (undated), 13-14 (April 25, 2017), 15 (May 14, 2017), 16 (June 16, 2017), 19 (undated), 21 (undated); Doc. 91-5, at 1 (July 18, 2017), 3 (July 22, 2017), 12 (undated), 14 (September 1, 2017), 15 (undated), 16 (September 5, 2017:   two fights), 17 (undated), 18 (undated), 19 (undated), 20 (September 25, 2017), 21 (October 13, 2017); Doc. 91-6, at 1 (undated), 2 (November 23, 2017), 3 (undated), 4 (November 26, 2017), 7 (December 17, 2017),  9 (undated), 12 (March 4, 2018), 13 (March 9, 2018), 14-15 (March 17, 2018), 16 (March 24, 2018), 17 (undated).[14] Seventeen of those assaults resulted in officers transporting an involved

---

[13]  The record reflects additional assaults occurred after April 18, 2018, but those assaults do not bear relevance to Plaintiffs' claims, as the last assault on any of the Plaintiffs occurred on April 18, 2018.

[14]  As portrayed, some of the copies from the jail logs do not bear dates.   Presumably, this results from counsel's filing only the relevant pages from the jail logs, with the (likely inadvertent but)

inmate to the emergency room for additional medical treatment.   (Doc. 91-3, at 1, 10 20; Doc. 91-4, at 1-2, 7, 11-12, 15, 21; Doc. 91-5, at 3, 17, 20; Doc. 91-6, at 3, 9, 12-17).

Other jail log notations indicate inmate assaults, specifically portraying that an inmate received an injury without confirmation that an assault occurred.   (*See* Doc. 91-3, at 3 (May 10, 2016:   "[inmate] face was swollen"); Doc. 91-4, at 20 (July 11, 2017: "Went in cell, [inmate] was laying on his back in bullpen.   He wasn't communicating with me."); Doc. 91-5, at 5 (undated:   "[inmate] was busted up pretty good his face was bloody and black & blue couple cuts, ask him what happen he said he fell in the shower and he was fine, [other officers were] not called about any situation that had happen[ed] in the past 24 hours about this")).   A reasonable factfinder may determine these injuries resulted from inmate assaults, as Williams testified that inmates often tell officers they fell in the shower when, in fact, another inmate assaulted them, because "they're not going to tell on each other."   (Doc. 85-45, at 15).

Sheriff Williamson testified that despite officers' precautions "inmate-on-inmate assaults happen in every jail" due to inmates' generally poor impulse control and their

---

consequent omission of pages bearing the dates for certain entries.   Defendants have not objected to the dates Plaintiffs assign to these incidents in their briefs.   Even so, the actual record evidence does not portray the dates, so the court has not assigned a date to the incidents.   In any event, the precise dates for these events do not prove material to Plaintiffs' point, as long as the incidents incurred within the relevant date range, as later discussed.

The record reflects additional assaults occurred after April 18, 2018, but those assaults do not bear relevance to Plaintiffs' claims, as the last assault on any of the Plaintiffs occurred on April 18, 2018.

frustrations over lost freedoms.   (Doc. 85-49, ¶ 10; *see also* Doc. 85-44, ¶ 7; Doc. 85-46, ¶ 5; Doc. 85-47, ¶ 7).   Rutland, Bowling, and Williams attested that most inmate-on-inmate assaults "are very short, generally just a few punches."   (Doc. 85-44, ¶ 7; Doc. 85-46, ¶ 5; Doc. 85-47, ¶ 7).   Williamson, Rutland, Bowling, and Williams opined that "[i]nmate assaults in the Colbert County Jail have never been so commonplace as to be viewed the norm or as routine."   (Doc. 85-44, ¶ 7; Doc. 85-46, ¶ 5; Doc. 85-47, ¶ 7; Doc. 85-49, ¶ 10).   Rutland, Bowling, and Williams testified that officers "did [their] best to reduce [inmate] fights by making sure inmates were observed/supervised, and by paying careful attention to any reports or requests to separate inmates who did not get along, and by removing inmates from cellblocks when they were in fear for their safety."   (Doc. 85-44, ¶ 7; Doc. 85-46, ¶ 5; Doc. 85-47, ¶ 7).   Officers typically do not inform Williamson of inmate assaults unless a serious assault requires an inmate's hospitalization.   (Doc. 85-49, ¶ 10).

Commissioner Gardiner acknowledged his general awareness of "safety and security issues, including for inmates and for officers, that are presented by the way [the jail] facility is set up," but he testified he did know of any incidents where inmates hurt other inmates.   (Doc. 85-54, at 7).   Commissioner Black testified he never had any discussions with the Sheriff or any other party regarding whether the physical state of the jail presented challenges to inmate safety, as inmate safety constituted "a management responsibility," which did not fall under the "purview of [his] duties as a

commissioner." (Doc. 85-55, at 28). He also testified that he did know about any problems with inmate-on-inmate violence until Plaintiffs filed these lawsuits. (*Id.* at 31).

## IX.   The Colbert County Commission's Stance on Jail Upkeep and Constructing a New Jail

Commissioner Creekmore acknowledged there exists "little debate that the [Colbert County] jail is an aged facility and needs to be larger." (Doc. 85-57, ¶ 4; *see also* Doc. 85-56, at 17 ("[T]he facility has some age on it.")).  Commissioner Gardiner agrees. (Doc. 85-54, at 5 ("Q:  In . . . general, would you agree that there's a, you know, need to replace the current jail?  A:  Yes.")).  In fact, County officials began discussing the jail's deficiencies as early as the 1970s, and constructing a new jail emerged as a political issue in the 1998 Sheriff's race. (Doc. 85-54, at 5; Doc. 85-55, at 30, 42).  However, Commissioner Black testified that the Commission did not "have to do anything," because they had been "funding the jail properly . . . according to the law," and even though the jail "is an older facility, . . . it still functions and operates as . . . the law intends." (Doc. 85-55, at 10).

The County Commission formed committees as early as 2009 to explore the possibility and costs of construction. (Doc. 85-54, at 7-8; Doc. 85-55, at 10, 12; Doc. 85-56, at 8-9).  However, as of Sheriff Williamson's September 17, 2020, deposition, the committee had not met "in a while." (Doc. 85-48, at 51).

The Commission has received building cost estimates as high as $20,000,000.

To finance the construction, the County would have to issue a bond that must be backed by a revenue stream.   The revenue stream will have to be in the form of a tax.   The County generally does not have taxing authority.   To accomplish obtaining a tax, the County must request that the local delegation of the legislature have an act passed by the legislature.   If there is an objection from any of the local delegation, the tax proposal is dead.   If the delegation agrees, an act is passed that proposes the tax but allows the citizens to vote on it.   Only if a majority of the voters agree, the tax will come into effect.   Then the bond can be obtained, and only then construction can begin.

(Doc. 85-57, ¶ 6; *see also* Doc. 85-56, at 7).

As of January 2021, the County had not "convince[d] the local delegation to support legislation for a tax for the construction of a new jail."   (Doc. 85-57, ¶ 6).   Likewise, the local community has not pushed for the construction of a new jail.   (Doc. 85-54, at 8).   The Commission continues to explore "every option to obtain funding for the jail," but in the meantime, it has "committed to maintaining the existing jail to exceed constitutional requirements."   (Doc. 85-57, ¶ 6).

Creekmore has placed "prime importance" on maintaining the jail due to its age and rate of deterioration, and he instructed the County's maintenance department to afford jail maintenance tasks priority over other tasks.   (*Id.* ¶ 4).   During 2018 and 2019, the maintenance department remodeled the elevator, showers, and dispatch area of the jail; painted the entire jail; and installed a new HVAC system.   (Doc. 85-53, ¶ 3-4; Doc. 85-57, ¶ 4).

47

The County Commission has increased the jail's funding each year, enabling additional jailer positions, increased jailer pay, and additional supplies, maintenance and repairs.   The Sheriff's Office and jail operations budget comprise approximately 40% of the County's total expenditures, which equates to approximately 48% after factoring out earmarked expenditures.   (Doc. 85-49, ¶ 21; Doc. 85-53, ¶ 4; Doc. 85-57, ¶¶ 4-5; Doc. 85-58; Doc. 85-59).

## X.    Expert Witness Testimony

Colbert County retained Joshua Arnold, a Captain in the Pima County, Arizona, Sheriff's Department, to provide an expert opinion regarding "the Colbert County Sheriff's Office Detention Facility's responsibility for operating a correctional facility and any perceived failure regarding detention staff's duty to protect inmates."   (Doc. 85-61, at 2, 9).   Arnold opined:

> Sheriff Williamson recognized that improvements were in order at Colbert County Jail and solicited the National Institute for Jail Operations to conduct a sweeping audit.   The purpose of the audit was for Sheriff Williamson to determine exactly what deficiencies existed at the Colbert County Jail and decide on a path in which to institute the improvements.   The fact that Sheriff Williamson solicited the audit from the National Institute for Jail Operations demonstrates he was in fact not deliberately indifferent to conditions at the Colbert County Jail.

> I have found nothing in my review of the materials that suggest[s] a "security crisis" existed at the Colbert County Jail.   Over the period of years fights and typical violence have taken place but nothing to suggest that a specific gang of inmates was organized and promoted increased violence against other inmates.   Corrections staff acted appropriately

when addressing each incident in this case by separating the inmates and ensuring they received prompt medical attention.

It is alleged that Colbert County is at fault for placing Peter Capote, accused but not guilty of capital murder, in the same housing unit as three of the defendants.   Colbert County Jail Officials utilize a classification system based on a number of factors that include allowing each detainee to look over a list of individuals in the housing unit to make sure they had no enemies.   They have access to criminal and institutional history that is critical to determine classification.   In addition, they used their unique expertise to evaluate each individual inmate and make a determination as to the best place to house them.   In small communities, where citizens often know one another, this method would be very effective.   Housing an inmate based solely on their criminal charges would be unwise and a violation of that inmate[']s rights.   Courts have held that small jails in particularly [sic] are only required to have a classification system with a very limited spectrum.

Colbert County has drastically increased the resources allotted to the Colbert County Corrections Facility.   This increase demonstrates the commitment to the safety and security of the inmate population housed at Colbert County Jail.   Sheriff Williamson and the Colbert County Commission have demonstrated through their actions outlined in this report that they have not been deliberately indifferent but have been proactive in instituting positive change at Colbert County Jail.

(*Id.* at 27).

Of particular note, Arnold signed his report on March 24, 2020, well after the

May 2016 to April 2018 period traversing Plaintiffs' assaults.   And, the report does not

indicate when the Defendants implemented any improvements to the jail, the large

majority of which do not pertain to the challenged conditions alleged in this action.

(*See id.* at 17-23).

49

## DISCUSSION

I.   **By Not Responding to Defendants' Summary Judgment Arguments, Plaintiff Alexander Abandoned His Failure to Protect Claims Against Individual Jailers Halcomb and Rutland, and All Plaintiffs Abandoned Their Claims for Declaratory and Injunctive Relief**

Plaintiff Alexander asserted a failure-to-protect claim against individual jailers Heath Halcomb and Marcus Rutland, who still served as a jailer, not as Jail Administrator, during the time period relevant to Alexander's claims.   Those Defendants argued in their summary judgment briefs that the doctrine of qualified immunity protected them from liability on Alexander's failure to protect claim. (*See* Doc. 94 in 3:18-cv-01296-HNJ, at 16-33).   Plaintiffs did not respond to Defendants' arguments in their consolidated summary judgment response brief.   (*See* Doc. 99 in 3:18-cv-01296-HNJ).   Rather, the response brief refers to Colbert County, Sheriff Williamson, and Jail Administrators Bowling and Rutland collectively as "the sheriff defendants" (*see id.* at 9), and Plaintiffs discuss only their claims against the "sheriff defendants" when they argue against summary judgment.

The failure of a party to oppose a claim in a pending motion may constitute an abandonment of such claim.   *See, e.g., Coal. for the Abolition on Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) (finding that a party's failure to brief and argue an issue before the district court renders the claims abandoned); *Hooper v. City of Montgomery*, 482 F. Supp. 2d 1330, 1334 (M.D. Ala. 2007) (concluding that a plaintiff's

failure to respond to claims in a defendant's motion to dismiss resulted in dismissal of those claims as abandoned).   By declining to respond to Defendants' arguments regarding Alexander's direct, failure-to-protect claims against Halcomb and Rutland, Plaintiffs impliedly heeded the merits of Defendants' contentions regarding those claims.   *See, e.g.*, *Edmondson v. Bd. of Trs. of Univ. of Ala.*, 258 F. App'x. 250, 253 (11th Cir. 2007) (finding that "grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned") (citing *Resolution Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995)).   The court thus finds Alexander abandoned his direct, failure-to-protect claims against Halcomb and Rutland, and will grant summary judgment in those Defendants' favor on those claims.

In addition, each Plaintiff requested "[a]ppropriate declaratory and injunctive relief to remedy the unlawful policies and customs at the jail."  (Doc. 25 in 3:18-cv-01218-HNJ, ¶ 96(a); Doc. 34 in 3:18-cv-01296-HNJ, ¶ 65(a); Doc. 26 in 3:18-cv-01382-HNJ, ¶ 91(a); Doc. 1 in 3:18-cv-01755-HNJ, ¶ 91(a); Doc. 1 in 3:20-cv-00333-HNJ, ¶ 31(a)).   Defendants moved for summary judgment on those items of relief.   (*See* Doc. 88 in 3:18-cv-01218-HNJ, at 60-62; Doc. 94 in 3:18-cv-01296-HNJ, at 78-79; Doc. 83 in 3:18-cv-01382-HNJ, at 68-69; Doc. 74 in 3:18-cv-01755-HNJ, at 57-58; Doc. 29 in 3:20-cv-00333-HNJ, at 45-47).   Plaintiffs did not respond to Defendants' arguments in their consolidated summary judgment response brief.   (*See* Doc. 93 in 3:18-cv-01218-HNJ; Doc. 99 in 3:18-cv-01296-HNJ; Doc. 88 in 3:18-cv-01382-HNJ; Doc. 79

in 3:18-cv-01755-HNJ; Doc. 34 in 3:20-cv-00333-HNJ). Therefore, Plaintiffs abandoned their claims for declaratory and injunctive relief, and the court will grant summary judgment in Defendants favor on those claims. *See Edmondson*, 258 F. App'x. at 253 (citing *Resolution Tr. Corp.*, 43 F.3d at 599).

## II. Genuine Disputes of Material Fact Preclude Qualified Immunity for Sheriff Williamson and Jail Administrators Bowling and Rutland on Plaintiffs' Excessive Risk of Inmate Violence Claims

Williamson, Bowling, and Rutland assert that the doctrine of qualified immunity protects them from liability on Plaintiffs' excessive risk of inmate violence claims. Qualified immunity protects government officials performing discretionary functions in their individual capacities from civil suit and liability "'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hill v. Cundiff*, 797 F.3d 948, 978 (11th Cir. 2015) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

"When a court concludes [an official] was engaged in a discretionary function, 'the burden shifts to the plaintiff to show that the defendant is *not* entitled to qualified immunity.'" *Hill*, 797 F.3d at 978 (emphasis in original) (citation omitted). There exists no dispute Williamson, Bowling, and Rutland performed discretionary functions in these circumstances, so Plaintiffs bear the burden of persuasion on the balance of the qualified immunity inquiry: whether Williamson, Bowling, and Rutland violated a

constitutional right, and whether the right was clearly established at the time of the alleged violation.

When determining whether the law clearly established relevant conduct as a constitutional violation, courts consider whether officers possessed "fair warning" that the conduct at issue violated a constitutional right.   *Gaines v. Wardynski*, 871 F.3d 1203, 1208 (11th Cir. 2017).   The assessment of fair warning may proceed in three methods:

> *First*, the plaintiffs may show that a materially similar case has already been decided. *Second*, the plaintiffs can point to a broader, clearly established principle that should control the novel facts of the situation. *Finally*, the conduct involved in the case may so obviously violate the constitution that prior case law is unnecessary. Under controlling law, the plaintiffs must carry their burden by looking to the law as interpreted at the time by the United States Supreme Court, the Eleventh Circuit, or the [relevant State Supreme Court].
>
> * * *
>
> The second and third methods are generally known as "obvious clarity" cases. . . . They exist where the words of the federal statute or constitutional provision at issue are "so clear and the conduct so bad that case law is not needed to establish that the conduct cannot be lawful," or where the case law that does exist is so clear and broad (and "not tied to particularized facts") that "every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted." . . . Cases do not often arise under the second and third methods.

*Id.* at 1208-09 (alteration and emphasis in original) (citations omitted).[15]

---

[15] Despite Plaintiffs' entreaties, these cases cannot proceed under the second or third methods of evaluating officers' entitlement to qualified immunity.   First, the Eighth Amendment's (by way of the Fourteenth Amendment's) terms do not provide a straightforward, clear assessment of the claims at issue, and as these cases demonstrate, the case law relies upon particularized facts vis-à-vis specified

When the court relies upon factually similar case law, it

must look at the facts in the precedent and at the facts that confronted the government official in the case before the court.   The two sets of facts must be materially similar.   For qualified immunity purposes, a preexisting precedent is materially similar to the circumstances facing an official when the specific circumstances facing the official are enough like the facts in the precedent that no reasonable, similarly-situated official could believe that the factual differences between the precedent and the circumstances facing the official *might* make a difference to the conclusion about whether the official's conduct was lawful or unlawful, in the light of the precedent.   Thus, every fact need not be identical.   But minor variations in some facts (the precedent lacks an arguably significant fact or contains an additional arguably significant fact not in the circumstances now facing the official) might be very important and, therefore, be able to make the circumstances facing an official materially different from the preexisting precedents, leaving the law applicable – in the circumstances facing the official – *not* clearly established when the defendant official acted.

*Marsh v. Butler Cnty., Ala.,* 268 F.3d 1014, 1032 (11th Cir. 2001) (*en banc*) (emphasis in

original), *abrogated on other grounds by Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).

---

conditions and features. In a nutshell, determining whether a Sheriff and/or Jail Administrator demonstrated deliberate indifference to a substantial risk of excessive inmate assaults generally constitutes a fact-specific inquiry.   As the Supreme Court has held, not "every injury suffered by one prisoner at the hands of another . . . translates into constitutional liability for prison officials responsible for the victim's safety." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).   Only "an *excessive* risk of inmate-on-inmate violence at a jail creates a substantial risk of serious harm; 'occasional, isolated attacks by one prisoner on another may not constitute cruel and unusual punishment, [but] confinement in a prison where violence and terror reign is actionable.'"   *Purcell ex rel. Estate of Morgan v. Toombs Cnty., Ga,*, 400 F.3d 1313, 1320 (11th Cir. 2005) (alteration in original) (emphasis added) (citation omitted).   That determination necessarily involves a contextual assessment of the relevant facts, as does assessing the reasonableness of Defendants' response to the risk.   Thus, the court must examine factually similar case law to assess Defendants' entitlement to qualified immunity.   *See Marsh v. Butler Cnty., Ala.,*, 268 F.3d 1014, 1031 (11th Cir. 2001) (*en banc*) ("Two sets of circumstances may be 'nearly' the same, but 'nearly' can make a great legal difference at the edge.").

54

Importantly for the qualified immunity determination, "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (citation omitted).   A "'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'"   *Id.* (citation omitted). Therewith, movants must show "'there is no genuine issue as to any material fact and [they are] entitled to judgment as a matter of law,'" and courts "must view the evidence "in the light most favorable to the opposing party.'"   *Id.* at 656-57 (citations omitted). Accordingly, the Court's "qualified-immunity cases illustrate the importance of drawing inferences in favor of the nonmovant, even when . . . a court decides only the clearly-established prong of the standard."   *Id.* at 657.   Therefore, "courts must take care not to define a case's 'context' in a manner that imports genuinely disputed factual propositions."   *Id.* (citation omitted).

Applying the foregoing precepts demonstrates that genuine disputes of material fact preclude Williamson, Bowling, and Rutland from entitlement to qualified immunity for Plaintiffs' excessive risk of inmate violence claims.

## A.    Legal Framework for Excessive Risk of Inmate Violence Claims

"'[P]rison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners.'"   *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (ellipsis in original) (citations omitted).

Having incarcerated "persons [with] demonstrated proclivit[ies] for antisocial criminal, and often violent, conduct," *Hudson v. Palmer, . . . ,* 468 U.S.[ 517, 526 (1984)] , having stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course. *Cf. DeShaney[ v. Winnebago Cty. Dep't of Soc. Servs.,]* 489 U.S. [189,] 199-200[ (1989)]; *Estelle*[*v. Gamble*], 429 U.S. [97,] 103-104[ (1976)]. Prison conditions may be "restrictive and even harsh," *Rhodes*[ *v. Chapman*]*,* 452 U.S.[ 337,] 347[ (1981)], but gratuitously allowing the beating or rape of one prisoner by another serves no "legitimate penological objectiv[e]," *Hudson v. Palmer, supra,* 468 U.S., at 548, 104 S. Ct., at 3211 (STEVENS, J., concurring in part and dissenting in part), any more than it squares with "'evolving standards of decency,'" *Estelle, supra,* 429 U.S., at 102, 97 S. Ct., at 290 (quoting *Trop v. Dulles,* 356 U.S. 86, 101, 78 S. Ct. 590, 598, 2 L. Ed. 2d 630 (1958) (plurality opinion)). Being violently assaulted in prison is simply not "part of the penalty that criminal offenders pay for their offenses against society." *Rhodes, supra,* 452 U.S., at 347, 101 S. Ct., at 2399.

*Farmer*, 511 U.S. at 833-34 (alterations to case citations added, other alterations in original).

To be sure, officials cannot guarantee an inmate's safety in all circumstances. *Purcell ex rel. Estate of Morgan v. Toombs Cnty., Ga.*, 400 F.3d 1313, 1321 (11th Cir. 2005) (quoting *Popham v. City of Talladega,* 908 F.2d 1561, 1564 (11th Cir. 1990)). Not "'every injury suffered by one prisoner at the hands of another . . . translates into [a] constitutional liability . . . .'" *Purcell*, 400 F.3d at 1319 (quoting *Farmer,* 511 U.S. at 833 (alterations in original) (citations omitted)). Nevertheless, "[w]ithin [a prison's] volatile 'community,' prison administrators are . . . under an obligation to take

reasonable measures to guarantee the safety of the inmates." *Hudson*, 468 U.S. at 526-27 (first alteration supplied).

Bearing in mind all those concerns, Plaintiffs may advance excessive inmate-on-inmate violence claims by demonstrating "'(1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation.'" *Goodman v. Kimbrough*, 718 F.3d 1325, 1331 (11th Cir. 2013) (quoting *Carter v. Galloway,* 352 F.3d 1346, 1349 (11th Cir. 2003) (*per curiam*)).[16]

---

[16] As Colbert County detained all Plaintiffs while they awaited trial on their respective criminal charges, the Fourteenth Amendment, not the Eighth Amendment, governs Plaintiffs' claims. *Grochowski v. Clayton Cty., Georgia through Turner*, 961 F.3d 1311, 1318 (11th Cir. 2020), *cert. denied sub nom. Grochowski v. Clayton Cty., Georgia*, 141 S. Ct. 1269, 209 L. Ed. 2d 9 (2021) (citing *Hamm v. DeKalb Cty.*, 774 F.2d 1567, 1572 (11th Cir. 1985); *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979)); *see also Dickinson v. Cochran*, 833 F. App'x 268, 271 n.3 (11th Cir. 2020) ("Because Dickinson was a detainee and not a prisoner, his 'constitutional rights arise not from the Eighth Amendment, but from the Due Process Clause of the Fourteenth Amendment.'" *Hale v. Tallapoosa County*, 50 F.3d 1579, 1582 (11th Cir. 1995) (citations and quotations omitted). As the Eleventh Circuit recently reiterated, so long as pretrial detention conditions of confinement and restrictions have a "legitimate governmental objective" and are not imposed for the purpose of punishment, the Fourteenth Amendment is not violated. *Grochowski* 961 F.3d at 1318 n.3 (citations omitted). Thus, Defendants violated the Fourteenth Amendment if they subjected Plaintiffs to a risk of inmate-on-inmate violence that lacked a legitimate governmental objective and only imposed punitive consequences.

However, circuit precedent obligates application of the Eighth Amendment conditions-of-confinement standard:

> When analyzing claims under the Due Process Clause, the Eleventh Circuit often refers to precedent under the Eighth Amendment's Cruel and Unusual Punishment Clause. *Keith v. DeKalb Cty.*, 749 F.3d 1034, 1044 n.35 (11th Cir. 2014) (quoting *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244, 103 S. Ct. 2979, 77 L. Ed. 2d 605 (1983)); *see also Cottrell v. Caldwell*, 85 F.3d 1480, 1490 (11th Cir. 1996). The Eleventh Circuit has thus recognized that "[a] prison official's deliberate indifference to a known, substantial risk of serious harm to an inmate violates the Fourteenth Amendment." *Keith*, 749 F.3d at 1047 (alteration incorporated) (quoting *Marsh v. Butler Cty.*, 268 F.3d 1014, 1028 (11th Cir. 2001) (*en banc*), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)).

## B. *Farmer v. Brennan,* Not the Supervisory Liability Causal Connection Standard, Provides the Appropriate Framework for Plaintiffs' Excessive Risk of Inmate Violence Claims

When a plaintiff sues officials in their supervisory capacities, the claim may not rest upon the doctrine of respondeat superior or the officials' vicarious liability for their subordinates' actions. *Keith v. DeKalb Cty., Georgia*, 749 F.3d 1034, 1047 (11th Cir. 2014) (quoting *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003), *abrogated in part on other grounds by Randall v. Scott*, 610 F.3d 701 (11th Cir. 2010)) ("'[I]t is well established in this Circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability.'"). Rather, "supervisory liability under § 1983 occurs either when the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation." *Cottone*, 326 F.3d at 1360.

> A causal connection may be established when: 1) a "history of widespread abuse" puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so; 2) a supervisor's custom or policy results in deliberate indifference to constitutional rights; or 3) facts support an inference that the supervisor directed the subordinates to act

---

*Grochowski*, 961 F.3d at 1318 (alteration in original)

Stated differently, courts predominantly apply Eighth Amendment standards to Fourteenth Amendment cases in this context: if an official subjects a pretrial detainee to cruel and unusual punishment pursuant to Eighth Amendment standards, the official also has inflicted punitive conditions lacking a legitimate governmental objective under the Fourteenth Amendment.

unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so.

*Valdes v. Crosby*, 450 F.3d 1231, 1237 (11th Cir. 2006) (citing *Cottone*, 326 F.3d at 1360).

"The standard by which a supervisor is held liable in [his] individual capacity for the actions of a subordinate is extremely rigorous." *Braddy v. Florida Dep't of Labor & Employment Sec.,* 133 F.3d 797, 802 (11th Cir. 1998).

Plaintiffs' response brief contends that Williamson, Bowling, and Rutland bear liability because of their status as supervisors, specifically positing a causal connection between those Defendants' actions and their own constitutional injuries.   (*See* Doc. 93 in 3:18-cv-01218-HNJ, at 48-49; Doc. 99 in 3:18-cv-01296-HNJ, at 48-49; Doc. 88 in 3:18-cv-01382-HNJ, at 48-49; Doc. 79 in 3:18-cv-01755-HNJ, at 48-49; Doc. 34 in 3:20-cv-00333-HNJ, at 48-49 ("As a starting point, the sheriff defendants are not absolved from liability merely because they were not personally involved in the assaults. . . . Instead, plaintiffs need only provide evidence from which a reasonable jury could conclude there is a 'causal connection' between defendants' actions and the assault against them.")).   Plaintiffs argue they can establish a causal connection between their constitutional injuries and the actions of Williamson, Bowling, and Rutland through the first two methods by demonstrating a history of widespread abuse and a custom or policy resulting in deliberate indifference.

59

However, after a review of the case law, the court concludes it should not frame the analysis in such a fashion.   Eleventh Circuit cases discussing excessive inmate-on-inmate violence claims do not resort to the supervisory liability causal connection framework; rather, precedent focuses upon whether a plaintiff suffered injury as a result of the official's deliberate indifference to a substantial risk of serious harm.   *Farmer,* 511 U.S. at 835-38.   As those cases provide, supervisory liability ensues, so long as Plaintiffs satisfy the *Farmer* standard, because defendants personally participated in the unconstitutional conditions of confinement due to the responsibility wielded by such officials for control and maintenance of the facilities. *C.f., Q.F. v. Daniel*, 768 F. App'x 935, 946 (11th Cir. 2019) ("[T]he defendants' supervisory positions suggest, at least by inference, that the defendants were aware of the staffing, classification, and segregation issues at Eastman.") (citing *Farmer*, 511 U.S. at 842 (allowing the plaintiff to establish subjective knowledge of a risk by inference or from circumstantial evidence)).

In *Marbury v. Warden*, 936 F.3d 1227, 1231 (11th Cir. 2019), the plaintiff, a state prisoner, asserted excessive risk of inmate violence claims against a warden and a corrections officer for the failure to protect him from assault by another prisoner.   *Id.* at 1231.   The Eleventh Circuit assessed whether the plaintiff's injuries resulted from the defendants' deliberate indifference to a substantial risk of serious harm, but it did not mention the supervisory liability causal connection factors, even though the

warden's liability ensued from his responsibilities in a supervisory position. *Id.* at 1232-33.

In *Keith v. DeKalb Cty., Georgia*, 749 F.3d 1034 (11th Cir. 2014), the Eleventh Circuit mentioned the supervisory liability causal connection standard. Yet in assessing the liability of the *sheriff*, it stated: "Turning to the matter at hand, in order to prove that Sheriff Brown violated Cook's constitutional rights, Keith must show that the Sheriff Brown [*sic*] had subjective knowledge of a risk of serious harm to Cook and that he recklessly disregarded that risk." *Id.* at 1048.

In *Marsh v. Butler Cty., Ala.*, 268 F.3d 1014 (11th Cir. 2001), a convicted inmate and a pretrial detainee sued Butler County, Alabama, the Butler County Commission, and the Sheriff for deliberate indifference to dangerous conditions, including excessive inmate-on-inmate violence, at the Butler County Jail that allegedly led to their assaults at the hands of other inmates. *Id.* at 1023-26. The Eleventh Circuit discussed whether the Sheriff demonstrated deliberate indifference to a serious risk of substantial harm, but it did not mention the supervisory liability standard. *Id.* at 1028-34.

In *Hale v. Tallapoosa Cty.*, 50 F.3d 1579 (11th Cir. 1995), the plaintiff asserted claims against a Sheriff and a jailer for their alleged deliberate indifference to an excessive risk of inmate violence at the jail. *Id.* at 1580. The Eleventh Circuit noted that to prevail against the Sheriff and jailer, the plaintiff "was required to show that they were personally involved in acts or omissions that resulted in the constitutional

deprivation," but the Court did not discuss the Sheriff's supervisory liability. *Id.* at 1582. Rather, the discussion focused upon whether the Sheriff demonstrated deliberate indifference to a substantial risk of serious harm. *Id.* at 1582-85. *See also Purcell*, 400 F.3d 1313 (no discussion of the supervisory liability, causal connection standard); *Q.F.*, 768 F. App'x 935 (same).

Based upon this authority, the court does not need to confine its analysis to the Eleventh Circuit's supervisory liability causal connection framework. Rather, pursuant to *Farmer v. Brennan* and other precedent, the court will assess whether the assaults Plaintiffs suffered resulted from Defendants' deliberate indifference to a substantial risk of inmate violence. Even so, the court heeds the Eleventh Circuit's admonition that Defendants' liability cannot rest upon the doctrine of respondeat superior, and the Supreme Court's admonition that it should only hold Defendants liable for their own misconduct. *See Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009); *Keith*, 749 F.3d at 1047. The court may ultimately hold each Defendant liable only if his own actions or inactions demonstrated deliberate indifference to Plaintiffs' safety.[17]

---

[17] In any event, the court notes the supervisory liability causal connection framework occupies common ground with the *Farmer v. Brennan* deliberate indifference analysis. The supervisory liability standard assesses whether a supervisor failed to correct deprivations despite knowledge of a history of widespread abuse. If a plaintiff achieved that showing, he also could likely demonstrate that the official disregarded a substantial risk of serious harm. The supervisory liability framework alternatively assesses whether a supervisor's custom or policy results in deliberate indifference to constitutional rights, leading to even more direct overlap with the *Farmer* standard.

### C. Genuine Disputes of Material Facts Portray Triable Claims for Deliberate Indifference to an Excessive Risk of Inmate Violence Pursuant to Clearly Established Constitutional Law

Plaintiffs have depicted genuine disputes of material fact whether Defendants violated their Fourteenth Amendment right to be free from an excessive risk of inmate violence pursuant to clearly established constitutional law.

#### 1. A reasonable juror could conclude Plaintiffs suffered a substantial risk of serious harm due to excessive inmate violence

As an initial matter, the Fourteenth Amendment (by way of Eighth Amendment standards) "requires that inmates be furnished with the basic human needs, one of which is 'reasonable safety.' . . . It is 'cruel and unusual punishment to hold convicted criminals in unsafe conditions.'" *Helling v. McKinney*, 509 U.S. 25, 33 (1993) (citations omitted); *see also Harrison v. Culliver,* 746 F.3d 1288, 1298 (11th Cir. 2014) ("Prison officials have an obligation to protect prisoners from violence inflicted upon them by other prisoners."); *Zatler v. Wainwright*, 802 F.2d 397, 400 (11th Cir. 1986) ("[I]t is well settled that a prison inmate has a constitutional right to be protected from the constant threat of violence and from physical assault by other inmates.") (citing, *inter alia, Gullatte v. Potts*, 654 F.2d 1007, 1012 (5th Cir. 1981)).

Courts objectively assess the first element of a claim for excessive risk of inmate violence by inquiring whether jail "'conditions . . . were extreme and posed an unreasonable risk of serious injury to [the inmate's] health or safety." *Marbury,* 936

63

F.3d at 1233 (quoting *Lane v. Philbin,* 835 F.3d 1302, 1307 (11ᵗʰ Cir. 2016)); *see also*

*Harrison*, 746 F.3d at 1298 (quoting *Marsh,* 268 F.3d at 1028-29) (The first element of

the deliberate indifference claim requires Plaintiffs to "demonstrate 'an objectively

substantial risk of serious harm to prisoners.'").

> In general, a plaintiff must show "more than a generalized awareness of risk" to make out a deliberate-indifference claim. While "occasional, isolated attacks by one prisoner on another may not constitute cruel and unusual punishment, . . . . confinement in a prison where violence and terror reign is actionable." To establish deliberate indifference based on a generalized risk, the plaintiff must show "that serious inmate-on-inmate violence was the norm or something close to it."

*Marbury,* 936 F.3d at 1234 (footnotes and citations omitted).

Several decisions present clearly established law as to the circumstances evincing

an excessive risk of inmate violence.   In particular, the Eleventh Circuit's decision in

*Marbury*, 936 F.3d 1227, establishes the standard and factors a court must review to

determine whether a facility maintains an excessive risk of inmate violence.  As the

following review portrays, *Marbury* requires a plaintiff to demonstrate an appreciable

rate of assaults, and specific features of the facility or its population, to satisfy this prong

of the *Farmer* standard for excessive inmate violence claims.   *Id.* at 1234-35.

In *Marbury*, a state inmate sued a warden and corrections officer for deliberate

indifference to a substantial risk to his safety.   *Id.* at 1231.   On February 12, 2016,

he submitted a written request to the warden to transfer him to a different dormitory

because in his dormitory, he had witnessed over 15 inmate-on-inmate stabbing

64

incidents that appeared to relate to gang activity.   He also made several in-person transfer requests to a corrections officer, but the warden and officer either ignored or denied his requests.   On April 5, 2016, Marbury followed up on his written request to the warden because he had witnessed prisoners disrespecting and attacking security staff without consequences.[18]   On April 23, 2016, another inmate stabbed Marbury and hit him in the face, breaking his nose.   *Id.* at 1231-32.

The Eleventh Circuit found those facts insufficient to support a claim for an excessive risk of inmate violence.   Marbury did not provide evidence regarding the total prison population, the sections of the prison in which the attacks occurred, or the relevant time period.   If the 15 stabbings Marbury identified spread over the course of his six-year incarceration, they occurred at an average rate of only 2.5 incidents per year. The Eleventh Circuit found that frequency presented only "some generalized risk of attack," not "serious inmate-on-inmate violence [that] was so pervasive that it constitutes a substantial risk of serious harm to which defendants were deliberately indifferent."   *Id.* at 1234.

The Court noted that in past cases, it found litigants had not established this prong of the *Farmer* standard when inmate violence occurred with even more

---

[18] Marbury also claimed the officer and the warden ignored and/or denied his requests for isolation because he heard another inmate wanted to hurt him.   *Marbury,* 936 F.3d at 1231-32.   That claim does not relate to the present controversy, as none of the present Plaintiffs argues they requested isolation or complained of a specific threat.

prevalence than the conditions Marbury described.   For example, in *Harrison v. Culliver*, 746 F.3d 1288 (11th Cir. 2014), the plaintiff did not present a viable claim for deliberate indifference to inmate-on-inmate violence when the warden knew of 33 inmate-on-inmate assaults between 2005 and August 6, 2008 (or approximately one assault every 39.8 days, assuming a start date of January 1, 2005), in a prison population comprising 830 to 990 inmates.   *Marbury,* 936 F.3d at 1234-35 (citing *Harrison,* 746 F.3d at 1298). Therefore, *Marbury* requires a demonstration of an appreciable rate of inmate-on-inmate assaults.

Moreover, the Court emphasized that in past cases "when we have held that a generalized risk of violence from a prison population could support a claim of deliberate indifference to a substantial risk of serious harm, the plaintiff has pointed to specific features of a facility or its population rendering it particularly violent," including "pervasive staffing and logistical issues rendering prison officials unable to address near-constant violence, tensions between different subsets of a prison population, and unique risks posed by individual prisoners or groups of prisoners due to characteristics like mental illness."   *Marbury,* 936 F.3d at 1235.   Because Marbury did not assert any "allegations regarding the specific features of the prison that would make it particularly violent," he could not have prevailed even if he "had shown a risk of generalized prison violence."   *Id.*; *see also Green v. Hooks*, 798 F. App'x 411, 427 (11th Cir.), *cert. denied*, 141 S. Ct. 249 (2020) ("Nor has Green pointed to any evidence that specific features of

Rodgers or its population render it particularly dangerous. Because Green has failed to offer evidence of pervasive staffing issues, logistical issues, or other risks posed by the prison population in Rodgers, we cannot say that Green has proven that the conditions at Rodgers posed a substantial risk of serious harm.") (footnotes omitted).

To support that analysis, the Eleventh Circuit cited its previous decisions in *Lane v. Philbin,* 835 F.3d 1302 (11th Cir. 2016), *Cottone v. Jenne*, 326 F.3d 1352 (11th Cir. 2003), *abrogated in part on other grounds by Randall v. Scott*, 610 F.3d 701 (11th Cir. 2010), and *Hale* 50 F.3d 1579.  *See Marbury,* 936 F.3d at 1235 n. 20-22.

In *Lane,* the plaintiff's complaint alleged he suffered an assault in a prison where a single officer supervised 100 inmates in two separate 50-man dormitories.  Ninety percent of inmates in those dormitories affiliated with a gang, and "[n]umerous stabbings and beatings – including those of non-Muslim and non-gang inmates" – took place.  *Lane,* 835 F.3d at 1305-06.  The dormitory residents fashioned "numerous weapons" from materials they salvaged from their work details or extracted from the prison structure itself.  Officers were "aware of the situation" in the dormitory, but they did not confiscate inmates' weapons.  *Id.* at 1306.  The inmate who assaulted Lane maintained a gang affiliation and had asserted previous threats.  *Id.*  The Eleventh Circuit found Lane's deliberate indifference claim could survive a motion to dismiss because the facts alleged, taken together, established jail officials' knowledge of a substantial risk of serious harm.  *Id.* at 1307-08.  The Eleventh Circuit cited *Marsh*,

268 F.3d at 1027-28, and *Williams v. Edwards*, 547 F.2d 1206, 1211 (5th Cir. 1977), for the proposition that inadequate supervision and ready access to weapon materials could constitute a substantial risk of serious harm.   *Lane,* 835 F.3d at 1307-08.

In *Cottone,* an inmate with a history of violence and schizophrenia fatally strangled Cottone in the Broward County, Florida, jail.   Officers knew of the assailant's mental condition, as he struck another inmate during the booking process a month earlier, and on the date of the incident, he acted "violent, out-of-control, and experience[ed] a schizophrenic episode."   *Cottone,* 326 F.3d at 1355-56.   Officers would have observed the assailant's schizophrenic episode if they had watched the surveillance cameras, but they played a computer game instead.   Despite the risks the assailant's behavior and condition presented, officers placed him and Cottone in neighboring cells without locking the cell doors.   *Id.*   The Eleventh Circuit found the assailant's history of violent outbursts and mental instability, and his recent schizophrenic episode, presented an objective risk of serious harm to Cottone.   *Id.* at 1358.

In *Hale,* a pretrial detainee in the Tallapoosa County Jail sued the Sheriff, a jailer, and the County for violations of his Eighth and Fourteenth Amendment rights after he suffered an assault that allegedly resulted from the defendants' deliberate indifference to an excessive risk of violence at the jail.   *Hale,* 50 F.3d at 1580.   The jailer placed Hale in a 13-by-20-foot cell, or "bullpen," that held up to 13 inmates during periods of overcrowding.   Overcrowding had occurred regularly during the past two years,

including on the date of Hale's detention, resulting in inmates sleeping on the cell floor, sometimes without mattresses or blankets. During such periods, "fights occurred between inmates on a regular basis and occasionally resulted in injuries requiring medical attention and hospitalization." *Id.* at 1580-81.

Soon after 6:00 p.m. on the day of Hale's assault, the jailer "opened the doors between the bullpen and two adjoining bed cells, leaving the inmates to decide among themselves who would stay in the bed cells, which had beds, and who would stay in the bullpen." *Id.* at 1581. At approximately 7:00 p.m., he re-closed the doors and "returned to his quarters, which were out of earshot and eyesight of the bullpen." *Id.* Hale remained in the bullpen, without a mattress, blanket or pillow. Because officers did not segregate inmates "based on their proclivity for violence or the reasons for their confinement," Hale shared the bullpen with another inmate detained on murder and attempted murder charges. *Id.* The jailer next checked on the bullpen at approximately 9:30 p.m., and the inmates greeted him with "hostile obscenities." *Id.* At approximately 10:30 p.m., the murder/attempted murder detainee and another inmate "punched and kicked Hale repeatedly without provocation, leaving him with a cut, bruises and contusions to his head, and an injured elbow." *Hale,* 50 F.3d at 1581. Hale yelled for help, but he did not receive a response, as the jailer did not check the bullpen again for the remainder of his shift, which ended at midnight. In fact, Hale's injuries remained undetected until approximately 1:30 a.m., when the jailer on the next

69

shift discovered them.   After learning of the assault, officers allowed Hale to spend the night in a different area of the jail.   *Id.*

The Eleventh Circuit upheld the district court's grant of summary judgment in favor of the jailer, but it reversed the grant of summary judgment in favor of the Sheriff and County.   *Id.* at 1582, 1585.   The Eleventh Circuit found Hale produced sufficient evidence of a substantial risk of serious harm because "inmate-on-inmate violence occurred regularly when the jail was overcrowded, as it was during" the relevant time period, and the violence occasionally escalated sufficiently to require medical attention or even hospitalization. *Id.* at 1583.

In addition, in *Marsh*, the Eleventh Circuit addressed whether the plaintiffs "sufficiently stated a claim against [Butler] County, its governing body, and its Sheriff for deliberate indifference to unsafe conditions at the county jail," to overcome those defendants' assertion of qualified immunity.   *Marsh,* 268 F.3d at 1021-22.   The Eleventh Circuit described the alleged conditions at the jail as follows:

> The Jail was an old building that had become extremely dilapidated by the summer of 1996.   Inmates were able to obtain makeshift weapons by cannibalizing parts of the decaying building.   Lack of adequate monitoring of the inmates allowed inmate activities to go mostly unchecked.   Locks to the doors of the inmates' cells did not work, resulting in the inability of the guards to lock down the prisoners.   Because prisoners were never locked down, jailers were afraid to conduct visual inspections of inmate cells on the second floor; most of the inmate population was kept on the second floor.   No visual or audio surveillance system was in place on the second floor, nor, did prisoners

have means to contact guards other than by screaming or banging on the walls.   Jailers never conducted prisoner headcounts.

Often, only one jailer was on duty at the Jail at a time.   This single jailer was responsible for controlling the entire inmate population, administering inmate intake and release, controlling the gate and fence surrounding the Jail, supervising visitation and outdoor exercise, handling mail, coordinating food service, dispensing medication, supervising trustees, answering the Jail telephone, and (at times) answering calls to the Butler County Sheriff's Department and operating the dispatch radio. Because the Jail was understaffed, inmate trustees were given many responsibilities for taking care of other inmates and maintaining the operation of the Jail.

In August 1995, the jail inspector for the Alabama Department of Corrections recommended that all Butler County jailers be trained in jail-management seminars.   By the time of the incidents underlying the complaint, few jailers had been so trained. Written procedures did not govern the Jail's operations.

Inmates entering the Jail were not screened for mental impairments or for whether they had conflicts with other inmates in the Jail.   No system of classification existed at the Jail:   pretrial detainees were housed with convicted inmates, nonviolent offenders with violent offenders, juveniles with adults, and mentally ill persons with those in good mental health.   Never were prisoners disciplined or segregated for assaulting other inmates, destroying jail property, or threatening jailers.   The Jail contained four eight-person cells, one four-person cell, trustee cells, two holding cells, one isolation cell and a cell for female inmates; but sometimes more than 50 inmates were imprisoned at the Jail.

Jail Administrator Thelma Teague ("Teague") told the Sheriff several times that the Jail needed more staff.   In February 1996, the jail inspector for the Alabama Department of Corrections informed Defendants that the Jail was not reasonably secure.   Defendants also received many complaints and requests for assistance from prisoners.   A letter from prisoner-rights advocates told Defendants that the Jail conditions posed "an immediate and serious threat to the safety of the

inmates" and made inmates "highly vulnerable to assault by other inmates."

*Id.* at 1024-25.

On July 2, 1996, four inmates attacked one of the plaintiffs in his cell for several minutes, resulting in injuries that required hospital treatment.   Other inmates yelled and banged on the walls of the cell to attract jailers' attention, but no jailer responded until ten to 15 minutes after the assault ended.   The attackers did not receive any discipline as a result of the incident, and the next day, they attacked the other plaintiff in the general population day room for 30 minutes to one hour, also inflicting injuries that eventually required hospital treatment.   During the second attack, the jail posted only one jailer on duty.   That jailer called for help, and another officer responded to assist approximately 20 minutes after the assault ended.   *Id.* at 1025-26.

When addressing the plaintiffs' excessive risk of inmate violence claim against the Sheriff, the Eleventh Circuit ruled the alleged conditions at the jail, taken as a whole, "present[ed] an objectively substantial risk of serious harm – including the risk of inmate-on-inmate attacks."   *Id.* at 1029.

In *Williams*,[19]  the former Fifth Circuit determined the totality of the following conditions violated prisoners' Eighth Amendment rights:

---

[19] All decisions of the former Fifth Circuit handed down prior to October 1, 1981, constitute binding precedent on this Circuit.   *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

> During the three years preceding the Special Master's hearings more than 270 stabbings of inmates by other inmates were reported; 20 deaths resulted. This deplorable condition is due to overcrowding and to lack of security. Numerous "forcible rapes" were committed on inmates by other inmates, the total number being unknown. Inmate dormitories were "terribly overcrowded" and insufficient cell space existed to segregate dangerous prisoners from the rest of the inmate population. The prison staff included too few guards to protect the inmates from one another through either supervision or through confiscation of weapons. Easy inmate access to unsupervised machinery and other resources resulted in widespread possession of weapons. Fire and safety hazards constituted an "immediate threat to the life and safety" of both inmates and staff. Multiple health and sanitation violations were in evidence, including accumulation of sewage under the main kitchen (since cleaned out) and including a "serious rodent problem."

*Williams,* 547 F.2d at 1211.

In *Gates v. Collier*, 501 F.2d 1291 (5th Cir. 1974), the former Fifth Circuit concluded the following conditions violated prisoners' Eighth Amendment rights to reasonable safety:

> The inmates are not classified according to the severity of their offense, resulting in the intermingling of inmates convicted of aggravated violent crimes with those who are first offenders or convicted of nonviolent crimes. In addition, the custodial responsibility of inmates has been assigned to other inmates who serve as hallboys, floorwalkers and cage bosses. Hallboys perform administrative duties; floorwalkers are non-trusties who perform custodial duties and on whose recommendation inmates may be punished. Cage bosses are charged with enforcing discipline in the barracks. The evidence is replete with instances of inhumanities, illegal conduct and other indignities visited by these inmates who exercise authority over their fellow prisoners.
>
> Although many inmates possess weapons, there is no established procedure for discovering and confiscating weapons, nor is possession of weapons reported or punished. The record revealed at least eighty-five

73

instances where inmates had physically assaulted other inmates; twenty-seven of these assaults involved armed attacks in which an inmate was either stabbed, cut or shot.

Only one civilian guard is assigned to each camp.   The one civilian guard is prohibited from entering the cages.   As stated by Superintendent Cook, penitentiary employees have no control over inmates after the lights are turned out and 'there is no way that anyone can guard the safety of an inmate in the Parchman situation,' because of the dormitory style system and the lack of civilian guards.   The district court found that in some cases, supervisory personnel have allowed inmates to fight, gamble and acquire liquor and drugs in violation of prison rules and state law.   The operation of the trusty system, as previously outlined, further compounds the dilemma of the protection of inmates.

*Id.* at 1308-09.

In contrast, in *Purcell ex rel. Estate of Morgan v. Toombs Cnty., Ga.*, 400 F.3d 1313, 1321 (11th Cir. 2005), the Eleventh Circuit declared the following conditions at a jail did *not* pose a substantial risk of serious harm:

Inmates at Toombs County Jail were segregated based on a number of particularized factors, including the kind of crime committed and an inmate's potential personal conflicts with others.   Moreover, the Jail was not understaffed on the night of the attack: five officers were on duty, which is typical for Toombs County.   Jail officials had a history of punishing inmate violence, rather than looking the other way to preserve the status quo.   And while inmate fighting does happen in Toombs County, the record is insufficient to show that serious inmate-on-inmate violence was the norm or something close to it.   Also, the fights that did occur were linked to no recurring specific cause: causes ran the gamut from disagreements over television channels, to retaliation for pre-incarceration street activity, to card games, to food.

*Id.* at 1321-22 (footnotes omitted).   Moreover, even though the evidence reflected "a few serious fights" in the past, none of those related to money, as did the attack in

question in the case.   *Id.* at 1323.   Finally, the physical layout of the jail itself did not

present an excessive risk of harm because, even though guards could not see into or

hear every cell at night from the control tower, they could see and hear cell activity

when they left the tower to conduct periodic checks.   *Id.*

Distilling the foregoing cases, the Eleventh Circuit fostered clearly established

law delineating the conditions that would sustain an excessive risk of inmate violence

claims.   In *Marsh,* the Eleventh Circuit found that the *Hale*, *Williams*, and *Gates*

decisions (and of course, the context set forth in *Marsh* itself), clearly established that

jail conditions posed a substantial risk of serious harm to inmates, even though those

decisions contained different circumstances.   According to the Eleventh Circuit, "no

reasonable sheriff could have concluded," after considering the pre-existing case law,

"that the alleged conditions at the Jail failed to pose a substantial risk of serious harm."

*Marsh,* 268 F.3d at 1034.   The Court compared the facts of previous cases to the facts

before it as follows:

> In *Hale,* evidence was presented of these conditions: 1) prisoners were
> not segregated based on their proclivity for violence, 2) there was only one
> jailer on duty, 3) the jailer's quarters were out of earshot and eyesight of
> the prisoners' cell, and 4) fights occurred between inmates on a regular
> basis resulting in injuries requiring medical attention and hospitalization.
> In *Williams,* the court concluded that *the totality of the circumstances* posed a
> substantial risk of serious harm due to inmate violence.   The
> circumstances in the prison showed this environment: 1) widespread
> possession of weapons, 2) no confiscation of weapons, 3) no segregation
> of violent from nonviolent inmates, 4) previous assaults, 5) overcrowding,
> 6) too few guards to supervise properly inmates, and 7) multiple reports

of stabbing, some resulting in death.   In *Collier,* the court concluded that these conditions pose a serious risk of harm to inmates: 1) possession of weapons by prisoners, 2) no established procedure for confiscating weapons, 3) lack of classification according to severity of offense, 4) no procedure for reporting previous assaults, 5) overcrowding, 6) lack of supervision by guards, 7) custodial responsibility assigned to incompetent and untrained inmates, and 8) at least 27 reported instances of armed assaults by inmates on other inmates.

In this case, Plaintiffs allege these things: 1) widespread possession of weapons by inmates, 2) weapons were not confiscated from prisoners, 3) no segregation of nonviolent inmates from violent inmates, pretrial detainees from convicted criminals, juveniles from adults, or inmates with mental disorders from those without mental disorders, 4) no discipline of inmates for violent behavior and previous assaults on other inmates, 5) at times the Jail housed more prisoners than the cells could accommodate, 6) the Jail was understaffed, 7) inadequate supervision by jailers, and 8) unsupervised prisoner trustees had custodial duties for other prisoners.

*Marsh*, 268 F.3d at 1033 n.12 (emphasis added).

As discussed, courts evaluate the totality of the circumstances, not whether an environment presents an identical context as precedent, when assessing whether there exists a substantial risk of inmate assaults.   *See Marsh,* 268 F.3d at 1029; *Gates*, 501 F.2d at 1309; *Williams,* 547 F.2d at 1211.   For excessive risk of inmate violence claims, a case falls within the contours of the Eleventh Circuit's clearly established law so long as the challenged facility exhibits an appreciable rate of assault, as well some of the "specific features" delineated in *Marbury*, *Marsh*, *Hale*, *Williams*, and *Gates*, and any other applicable precedent.   *See Purcell*, 400 F.3d at 1323 n. 23 ("We do not . . . establish either *Marsh* or *Hale* as the proverbial 'floor' of liability for Eighth Amendment [and

Fourteenth Amendment] purposes."); *c.f., Q.F.*, 768 F. App'x at 947 ("[W]e held . . . in 2010[ ] it was clearly established that the Eighth Amendment protected inmates from prison officials' indifference to a known risk of inmate-on-inmate violence.") (citing *Bowen v. Warden Baldwin St. Prison*, 826 F.3d 1312, 1325 (11th Cir. 2016)).

Bearing in mind the framework set forth in the above cases, a reasonable juror could conclude that the totality of the circumstances at the Colbert County Jail created a substantial risk of inmate-on-inmate violence if genuine disputes of fact resolve in Plaintiffs' favor.   In particular, the pre-existing Eleventh Circuit precedent previously discussed provided Defendants fair warning that the following conditions at the Colbert County Jail, if facts resolve in Plaintiffs' favor, presented a substantial risk of excessive inmate assaults:   the rate of assaults (noted in *Purcell,* 400 F.3d at 1323 n.1; *Hale*, 50 F.3d at 1580-81; *Williams*, 547 F.2d at 1211; *Gates*, 501 F.3d at 1308-09; *Marbury*, 936, F.3d at 1234-35; *Harrison*, 746 F.3d at 1298; *LaMarca*, 995 F.3d at 1541; and *Lane*, 835 F.3d at 1305-06); persistent overcrowding (noted in *Hale*, 50 F.3d at 1580-81; *Marsh*, 268 F.3d at 1025; *Williams*, 547 F.2d at 1211; and *Gates*, 501 F.2d at 1309); the specific risks posed by Capote and Young (noted in *Marbury*, 936 F.3d at 1235; *LaMarca*, 995 F.3d at 1538; *Green*, 798 F. App'x at 427; *McCray*, 509 F.2d at 1334; and *Lane*, 835 F.3d at 1307-08); deficiencies in inmate classification (noted in *Marsh*, 268 F.3d at 1025; *Hale*, 50 F.3d at 1581; *Williams*, 547 F.2d at 1211; and *Gates*, 501 F.2d at 1308); deficiencies in inmate discipline (noted in *Marsh*, 268 F.3d at 1025; *Lane*, 835 F.3d at 1306; *Purcell*,

77

400 F.3d at 1322; *Williams*, 547 F.2d at 1211; and *Gates*, 501 F.2d at 1308-09); and deficiencies in staffing and inmate monitoring (noted in *Marsh*, 268 F.3d at 1024; *Marbury*, 936 F.3d at 1235; *Lane*, 835 F.3d at 1305; *Cottone*, 326 F.3d at 1355-56; *Hale*, 50 F.3d at 1581; *Purcell*, 400 F.3d at 1321; *LaMarca*, 995 F.2d at 1538-39; *Williams*, 547 F.2d at 1211; and *Gates*, 501 F.2d at 1308).

### a. Rate of Inmate Assaults

Defendants asserted that most inmate-on-inmate assaults in the Colbert County Jail "are very short, generally just a few punches," and "[i]nmate assaults in the Colbert County Jail have never been so frequent or commonplace as to be viewed the norm or as routine."  (Doc. 85-44, ¶ 7; Doc. 85-46, ¶ 5; Doc. 85-47, ¶ 7; Doc. 85-49, ¶ 10). Defendants' expert also testified that only "fights and typical violence" occurred at the jail.  (Doc. 85-61, at 27).

However, to refute that testimony, Plaintiffs presented Jail Tracker reports and handwritten jail logs reflecting previous inmate assaults.[20]   Construed in the light most favorable to Plaintiffs, jail records reflect six inmate assaults occurred between May 1, 2016 (the earliest possible date of the first record presented to the court), and Ogletree's assault on August 10, 2016, or an average of one assault every 17 days.[21]   One of those

---

[20] As the Fourteenth Amendment requires assessing an excessive risk of inmate violence, the court includes in its description all incidents officers described as inmate fights and incidents of aggression involving Capote.

[21] Two undated incidents appear in the jail logs prior to the first documented assault on May 16, 2016.

assaults resulted in officials transporting an involved inmate to the emergency room for additional medical treatment.

Three additional assaults occurred prior to Alexander's assault on October 24, 2016, or an average of one assault every 25 days between August 11 and October 24, 2016. None of those assaults resulted in an inmate requiring emergency room treatment. In total, ten assaults (including the assault on Ogletree) occurred between May 1 and October 24, 2016, for an average of one assault every 17.7 days.

Thirty-four additional assaults or incidents of aggression occurred prior to Kryston's assault on June 19, 2017,[22] or an average of one assault every seven days between October 25, 2016, and June 19, 2017. Five of those assaults resulted in officials transporting an involved inmate to the emergency room for additional medical treatment, or an average of one emergency room visit every 47.6 days. In total, 45 assaults (including the assaults on Ogletree and Alexander) occurred between May 1, 2016, and June 19, 2017, for an average of one assault every 9.2 days.

---

(Doc. 91-3, at 1-2). Construing the facts in the light most favorable to Plaintiffs, the court will presume those incidents occurred prior to May 16, 2016, but after May 1, 2016. In addition, the court understands that additional assaults may have occurred prior to those noted, but the record does not contain evidence of those assaults. Therefore, the court may not consider any earlier incidents for purposes of ruling on summary judgment.

[22] The incidents of aggression comprise Capote's incidents, including the January 25, 2017, incident in which Capote wanted to fight another inmate, but officers removed the inmate from Capote's area before the fight occurred, and the April 18, 2017, incident in which officers intervened to stop Capote after he charged at an inmate worker. The number also includes the undated incidents of violence noted in the handwritten jail logs sometime between June 16, 2017, and July 18, 2017.

79

Thirty-eight additional assaults occurred prior to James's assault on March 11, 2018, or an average of one assault every seven days between June 20, 2017, and March 11, 2018.   Six of those assaults resulted in officials transporting an involved inmate to the emergency room for additional treatment, or an average of one emergency room visit every 44.2 days.   In total, 84 assaults (including the assaults on Ogletree, Alexander, and Kryston) occurred between May 1, 2016, and March 11, 2018, for an average of one assault every 8.1 days.

Three additional assaults occurred prior to Hargrove's assault on April 18, 2018, or an average of one assault every 12.7 days between March 12, 2018, and April 18, 2018.   All of those assaults resulted in officials transporting an involved inmate to the emergency room for additional medical treatment.   Overall, between May 1, 2016, the beginning of the period the court record reflects, and April 18, 2018, the date of the last Plaintiff's assault, 89 assaults (including the assaults on all Plaintiffs) occurred, for an average of one assault every 8.1 days.   Fifteen of those assaults, or approximately 17%, resulted in emergency room treatment, for an average of one trip to the emergency room every 47.9 days.

These observations reflect the frequency of inmate assaults increased after the attack on Alexander, from approximately one assault every 17 to 25 days to approximately one assault every seven to ten days.   In addition, calculated on a yearly basis, 21 assaults occurred between May 1 and December 31, 2016, for an average of

one assault every 11.7 days.   Fifty-nine assaults occurred during 2017, for an average of one assault every 6.2 days.   Nine assaults occurred between January 1, 2018, and April 8, 2018 (the date of the last assault on one of the five Plaintiffs), for an average of one assault every 12 days.

Indeed, these statistics may underrepresent the number of assaults that occurred at the Colbert County Jail during this time period.   As an example, the undersigned issued a report and recommendation in a case brought by Jacob Guy against the Colbert County Jail for alleged violations of the Constitution, including a failure-to-protect claim and a deliberate indifference to medical needs claim.   *See Guy v. Colbert County Jail*, No. 3:19-cv-00641-ACA-HNJ, Doc. 30 (N.D. Ala. July 15, 2021), *rept. & recommend. adopted*, 2021 WL 3721741 (N.D. Ala. Aug. 23, 2021).   Evidence submitted during the course of the case reveals that inmate Gouch assaulted Guy on November 17, 2017 (Court Exhibit (hereafter "CX") at 7, 11), a fact confirmed in the jail logs tendered in this case.   (Doc. 91-6 at 1.)   However, another inmate, Bates, assaulted Guy on the same day just before the assault by Gouch (CX at 6, 10, 13), a fact that the records filed with the court do not reflect.   Other evidence in the *Guy* case dated April 15 and 18, 2017, notes that Guy awakened in the middle of the night with inmate Inman choking him (CX at 2, 3), yet the court-filed records solely contain a reference on April 18, 2017, that Guy was "acting out and wanting to be moved."   Doc. 91-4 at 10.   Another record in the *Guy* case indicates he and inmate Flanagan engaged in a fight on February

81

19, 2018 (CX at 4), yet no such record exists in the filings with the court.   In the *Guy* case, corrections officers attested that Guy "started altercations with other inmates"; "would try and 'big boy' other inmates [by taking] things by force"; and "would get in fights" and "frequently fought with other inmates."   (CX at 6, 10, 13).   However, the records filed with the court do not depict Guy engaging in frequent fights.

These statistics contravene Defendants' assertions that inmate assaults were not frequent or commonplace.   A reasonable jury clearly could construe the pattern to represent more than occasional, isolated attacks among inmates, especially when compared to decisions rejecting excessive risk of inmate violence claims.   *See, e.g., Marbury*, 936 F.3d at 1234 (15 stabbings over the course of six years); *Harrison*, 746 F.3d at 1299-1300 (four assaults over a three-year period for a facility housing 830 to 990 inmates); *Purcell*, 400 F.3d 1323 n. 21 ("In a jail that houses over a hundred inmates, evidences of two to three pretty serious inmate fights over a period of nine months and of not very many other fights over a four-year span, cannot establish that serious inmate-on-inmate violence was frequent and pervasive."); *Green*, 798 F. App'x at 426–27 ("There is evidence that 28 reported incidents of sexual assault occurred over five years at Rodgers, which had a prison population of 1,500 inmates. . . .   [U]nder our precedent, these numbers do not rise to the level of demonstrating that Rodgers was 'a prison where violence and terror reigned.'") (citations omitted).   Contrastingly, the rate of assault at the Colbert County Jail from May 2016 to April 2018 surpasses the

statistics in decisions advancing such claims.   *See Marsh*, 268 F.3d at 1033 n. 12 (noting fights "on a regular basis" in the *Hale* circumstances, "multiple reports of stabbing" in the *Williams* circumstances, and "27 reported instances of armed assault" in the *Gates* circumstances).

In addition, courts invoking clearly established law should consider the rate of assaults vis-à-vis the size of a facility's population.   *See Marbury*, 936 F.3d at 1234 ("There is no evidence in the record of the total prison population . . . ."); *Harrison*, 746 F.3d at 1300 (considering the size of the facility when assessing an excessive risk of inmate violence).   At a relatively small jail such as Colbert County, which generally housed approximately 80 to 100 inmates, and sometimes more, 85 incidents represent a substantial rate of assault.   *See Harrison*, 746 F.3d at 1300 (quoting *Purcell,* 746 F.3d at 1321) (33 inmate assaults involving weapons over 1,313 days (January 1, 2005, to August 6, 2008), or an average of one assault every 39.8 days, did not "indicate that inmates were 'exposed to something even approaching the constant threat of violence.'"); *Maestas-Kaufman v. Hannah*, No. 714CV02258WMASGC, 2016 WL 11475029, at *4 (N.D. Ala. May 27, 2016), *report and recommendation adopted,* No. 714CV02258AKKSGC, 2016 WL 5349692 (N.D. Ala. Sept. 26, 2016) ("several instances . . . over the course of a year" represented "isolated, and wholly unrelated, incidents [that did] not demonstrate a history of widespread abuse"); *Sanders v. City of Dothan*, No. 1:07-CV-0008-MEF, 2008 WL 4277818, at *5 (M.D. Ala. Sept. 17, 2008) ("Three discrete incidents over the course

of a sixteen-month period that ended over two years before Sanders was allegedly subjected to unconstitutional conduct does not constitute widespread abuse that is 'obvious, flagrant, [and] rampant.'") (alteration in original) (citation omitted).

Defendants contend that the risk of inmate assaults was not a longstanding problem, primarily highlighting their testimony that violence was not the "norm or routine," and that the alleged risk of violence only occurred over a two-year period. As to the first point, the court need not give credence to Defendants' representations as to the level of violence, particularly given the statistics described previously as to the number of inmate assaults.   The factfinder at trial must decide whether those statistics bear veracity.

As for the assertion that a two-year period does not reflect a longstanding problem, the precedent does not require the existence of a longstanding problem. Rather, Plaintiffs must prove Defendants were deliberately indifferent to an excessive risk of inmate violence that caused their injuries, which may manifest without any requirement vis-à-vis a particular length of time.   *See Farmer*, 511 U.S. at 842 (Remarking that a plaintiff may present "evidence showing that a substantial risk of inmate attacks was 'longstanding, pervasive, well-documented, *or* expressly noted by prison officials in the past . . . .'") (emphasis added); *c.f., Keith*, 749 F.3d at 1048 (For supervisory liability under the causal connection alternative, the "'deprivations that constitute widespread abuse sufficient to notify the supervising official must be

84

obvious, flagrant, rampant and of continued duration, rather than isolated occurrences.'") (quoting *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999)).   In any event, a reasonable juror may find that the NIJO report depicts the risk of inmate violence at the Colbert County Jail was longstanding based upon the systemic issues delineated therein.

Notwithstanding the genuine dispute of material fact regarding the rate of inmate assaults at the Colbert County Jail, *Marbury* also requires consideration whether "specific features of a facility or its population render[ed] it particularly violent." *Marbury,* 936 F.3d at 1231-32.   Here, sufficient evidence exists for a reasonable juror to conclude that other features of the Colbert County Jail and its population created a substantial risk of violence among inmates.

### b. Violence by Capote and Associates

As countenanced previously, clearly established law provides that specific features of a facility's population may render it particularly violent.   As Circuit precedent maintains, "where prison officials have failed to control or separate prisoners . . . who endanger the physical safety of other prisoners, prison officials may be required to take steps to protect the prison population from those dangerous prisoners." *McCray v. Sullivan*, 509 F.2d 1332, 1334 (5th Cir. 1975) (citing *Gates*, 501 F.2d at 1308-10; *Holt v. Sarver*, 309 F. Supp. 362 (E.D. Ark., 1970), *aff'd* 442 F.2d 304 (8th Cir. 1971)); *see also Cottone*, 326 F.3d at 1360 ("We conclude that prior factually similar case law gave

fair and clear warning to [defendants] that it was their duty to monitor and to supervise known violent inmates who posed a substantial risk of serious harm to other inmates.").

A reasonable juror could find that specific characteristics of the Colbert County Jail population – namely, the presence of Capote and Young – presented an excessive risk of inmate-on-inmate violence. Even though no jury had yet convicted Capote and Young during the relevant time period, the nature of their charges demonstrated at least a potentially elevated risk of violence.

Indeed, Capote presented a greater danger than other inmates. Most strikingly, Rutland conceded that Capote was a "cell boss," which means he ran the cell block at which he was located and typically retained power to administer violence with the assistance of confederates, just "not all the time." (Doc. 85-43 at 32). The evidence bears out his menacing reign. As discussed, the record documents 84 total assaults between May 1, 2016, and April 18, 2018. Capote participated in at least ten of those incidents – a disproportionate share of the violence in an inmate population that generally numbered between 80 and 100. Young participated in four violent incidents – not as many as Capote, but still a disproportionate number. The Eleventh Circuit has repeatedly determined that the presence of particularly dangerous inmates contributes to an increased risk of inmate violence. *See Lane,* 835 F.3d at 1305-06 (considering the risk of violence from inmates with gang affiliations who targeted non-gang and non-Muslim inmates); *Cottone,* 326 F.3d at 1355-56 (the plaintiff's assailant

struck another inmate during the booking process, had a history of mental health problems, and experienced a violent, out-of-control schizophrenic episode on the day of the assault); *Hale,* 50 F.3d at 1581 (considering that the jail detained Hale's assailant on capital murder charges).[23]

### c. *Staffing and Level of Monitoring*

Regarding specific features of the facility, the court first considers staffing and the level of inmate monitoring and supervision.  The Jail Administrator attempted to schedule up to four officers each shift, but the record evidence depicts that often only two officers worked a shift.  As one officer always remained on the first floor to monitor the cameras and phones, sometimes only a single officer roved the cell block areas and performed cell checks.  That single officer also bore responsibility for responding to all inmate incidents.  In addition, the jail logs depict officers performed varying tasks while on duty other than roving and monitoring, such as "pulling" laundry and trash; retrieving ice and mop buckets; preparing and distributing "chow"; and transporting inmates around the facility for various reasons, such as washing cars, sick bay, etc.  *See, e.g.*, Doc. 91-3.  As discussed, the evidence gives rise to the reasonable

---

[23] Review of the circumstances in *LaMarca v. Turner*, 662 F. Supp. 647 (S.D. Fla. 1987) – the case affirmed by the Eleventh Circuit as evincing an excessive risk of inmate violence, 995 F.2d 1526 (11th Cir. 1993) – illustrates the propriety of applying this factor in this case.  In *LaMarca*, an inmate "wolf-assailant" raped one inmate, assaulted another, and stabbed another over a one-year period.  *LaMarca* 662 F. Supp. at 682-83.  The prevalence of those assaults pales in comparison to Capote's violent transgressions as a cell boss at the Colbert County Jail.

inference that only one officer worked during Ogletree's assault; two officers worked during Alexander's assault; possibly one officer worked during Kryston's assault; two or three officers worked during James's assault; and two officers worked during Hargrove's assault. Moreover, the video monitoring system provided only limited surveillance of the cells.

A reasonable jury could find that such a level of supervision could create a substantial risk of excessive inmate-on-inmate violence.   *See Marbury,* 936 F.3d at 1235 (noting that "pervasive staffing . . . issues" bear relevance); *Lane,* 835 F.3d at 1305 (a single officer supervised 100 inmates in two separate dormitories); *Cottone,* 326 F.3d at 1355-56 (officers did not diligently monitor surveillance cameras); *Hale,* 50 F.3d at 1581 (the jailers' station was "out of earshot and eyesight of the bullpen"); *Marsh,* 268 F.3d at 1024 ( "[l]ack of adequate monitoring of the inmates allowed inmate activities to go mostly unchecked" and "[o]ften, only one jailer was on duty at the Jail at a time"); *Purcell,* 400 F.3d at 1321 (the jail "was not understaffed on the night of the attack"); *LaMarca v. Turner*, 995 F.2d 1526, 1538-39 (11th Cir. 1993) (reviewing the effect of lack of adequate patrols, the Sheriff's failure to station officers to patrol throughout dormitories, and officers' practice of allowing inmates to obscure officers' vision into their dormitories); *Williams*, 547 F.2d at 1211 (the prison employed "too few guards to protect the inmates from one another through either supervision or through confiscation of weapons"); *Gates*, 501 F.2d at 1308 (considering that "[o]nly one civilian

88

guard is assigned to each camp").

### d. Failure to Train Officers

Genuine disputes of material fact exist whether the Colbert County Jail properly trained its officers, an omission which contributes to a substantial risk of excessive inmate violence.   The Sheriff presented conflicting testimony regarding the level of training jail officers received.   In his affidavit, he stated that he required the Jail Administrator and other officers to attend NIJO training, provided two hours of weekly training to each officer, and required all new officers to attend the Alabama Jail training academy.   In his deposition, he stated that only the Jail Administrator receives formal training, and other officers receive on-the-job training.   A reasonable jury could credit either version of the Sheriff's testimony, or neither version, in light of Officer Halcomb's September 24, 2019, testimony that he had not received any training for eight years.

Construing the facts in the light most favorable to Plaintiffs, with all reasonable inferences accorded thereto, the court will consider that jailers did not receive any formal training.   The Eleventh Circuit has recognized that a jail's failure to appropriately train its officers can contribute to an increased risk of inmate violence. *See Marsh,* 268 F.3d at 1024 (some officers had not received recommended training); *LaMarca*, 995 F.2d at 1537 (considering the effect of "improper and inadequate staff training").

89

### e. Overcrowding

A reasonable juror also could conclude that persistent overcrowding in the Colbert County Jail contributed to a substantial risk of excessive inmate-on-inmate violence. There exists no dispute the jail consistently housed 20 to 40 more inmates than its design intended, and perhaps more given the Sheriff's concession in the press that the jail regularly housed 100 to 125 detainees. Such population sizes represent a significant overage given the ideal capacity of 64 detainees. The Sheriff testified that overcrowding never presented a security risk, but a reasonable juror could conclude otherwise based upon the prevalence of inmate-on-inmate attacks. The Eleventh Circuit has consistently recognized overcrowding as a contributing factor to increased inmate violence. *See Hale,* 50 F.3d at 1580-81 (noting that overcrowding occurred regularly, leading to increased inmate violence); *Marsh,* 268 F.3d at 1025 (considering that the jail sometimes housed more inmates than its capacity dictated); *Williams*, 547 F.2d at 1211 ("[i]nmate dormitories were 'terribly overcrowded'").

### f. Classifying Detainees

Despite Defendants' expert's assertion that the Colbert County Jail implemented effective classification procedures, a reasonable juror also could conclude that the Colbert County Jail's practices of housing inmates facing non-violent charges together with inmates facing violent charges subjected Plaintiffs to a substantial risk of excessive inmate-on-inmate violence. Jail policy required separating felony offenders from

misdemeanor offenders, and officers also attempted to separate inmates with known conflicts.   However, all efforts at segregation fell subject to the limitations of the size of the facility.

The Sheriff acknowledged the jail had not performed well at segregating violent and non-violent inmates prior to the incidents involving Plaintiffs, and that the size of the facility limited officers' ability to implement an effective segregation policy.   The Eleventh Circuit has consistently identified lack of inmate segregation as a factor contributing to increased inmate-on-inmate violence. *See Marbury,* 936 F.3d at 1235 (attributing relevance to persistent logistical issues); *Hale,* 50 F.3d at 1581 (officers did not segregate inmates "based upon their proclivity for violence or the reasons for their confinement"); *Marsh,* 268 F.3d at 1025 ("[n]o system of classification existed at the Jail" and officers did not segregate inmates who attacked other inmates); *Williams*, 547 F.2d at 1211 ("insufficient cell space existed to segregate dangerous prisoners from the rest of the inmate population"); *Gates,* 501 F.2d at 1308 ("inmates are not classified according to the severity of their offense, resulting in the intermingling of inmates convicted of aggravated violent crimes with those who are first offenders or convicted of nonviolent crimes").

> ### g.  *Disciplining Detainees*

In addition, despite Defendants' assertions that they inflicted appropriate discipline and Defendants' expert's assertion that officers responded appropriately to

91

inmate violence, a reasonable juror could conclude that the Colbert County Jail's failure to consistently discipline inmates who committed violent acts subjected Plaintiffs to a substantial risk of excessive inmate violence. Jail policy and practice required disciplining inmates who initiated assaults, and officers attempted to inflict discipline by isolating inmates in a drunk tank cell or revoking commissary, telephone, and visitation privileges.

However, the efforts at discipline fell subject to the limitations of the size of the facility. The Sheriff acknowledged that the size of the jail limited officers' ability to inflict effective discipline. Indeed, the NIJO report records one incident where a detainee assaulted a jail officer with no discipline inflicted for the transgression. The Eleventh Circuit has consistently identified ineffective discipline as a factor contributing to increased inmate violence. *See Lane,* 835 F.3d at 1306 (officers did not confiscate inmates' weapons); *Marsh,* 268 F.3d at 1025 (officers did not discipline inmates who attacked other inmates); *Purcell,* 400 F.3d at 1322 ("[j]ail officials had a history of punishing inmate violence").

In summary, if the disputable issues of material fact resolve in Plaintiffs' favor, a reasonable juror could conclude that the history of inmate violence, coupled with other specific features of the Colbert County Jail facility and population, presented an unreasonable risk of serious injury to Plaintiffs' safety by exposing them to an environment where inmate violence exceeded the level of occasional, isolated attacks,

and instead approached typicality.   Even if none of those factors, considered in isolation, presented a substantial risk of serious harm, the totality of the circumstances did present such a risk.   *See Marsh,* 268 F.3d at 1029 ("*Taken as a whole*, these alleged conditions, if true, present an objectively substantial risk of serious harm — including the risk of inmate-on-inmate attacks — to inmates.") (emphasis supplied); *Gates*, 501 F.2d at 1309 ("Each factor separately, i.e., overcrowding dormitory barracks, lack of classification according to severity of offense, untrained inmates with weapons, lack of supervision by civilian guards, absence of a procedure for confiscation of weapons, may not rise to constitutional dimensions; however, the effect of *the totality of these circumstances* is the infliction of punishment on inmates violative of the Eighth Amendment, as determined by the trial court.") (emphasis added); *Williams,* 547 F.2d at 1211 ("Thus the District Judge was fully justified in finding that *the totality of circumstances* as to conditions of confinement at Angola amounted to a violation of the eighth amendment.") (emphasis supplied).

Accordingly, Plaintiffs sustain the summary judgment challenge on the first element of their excessive risk of inmate violence claim by demonstrating genuine disputes of material fact whether they suffered a substantial risk of serious harm.

2.     **Genuine disputes of material fact persist whether Defendants displayed deliberate indifference to the substantial risk inmates would suffer excessive inmate violence**

Plaintiffs must next demonstrate a genuine dispute of material fact whether Defendants displayed deliberate indifference to the alleged substantial risk inmates would suffer excessive inmate violence.  This requirement has two components, one subjective and one objective.  To satisfy the subjective component, Plaintiffs must produce evidence that Defendants "actually (subjectively) kn[ew] that an inmate [faced] a substantial risk of serious harm." *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11ᵗʰ Cir. 2014) (citing *Rodriguez v. Sec'y for Dep't of Corr.,* 508 F.3d 611, 617 (11ᵗʰ Cir. 2007) (alterations in original)).  "The defendant 'must be aware of specific facts from which an inference could be drawn that a substantial risk of serious harm exists — and the [defendant] must also draw that inference.'" *Id.* (quoting *Carter*, 352 F.3d at 1349) (alteration in original).  To satisfy the objective component, Plaintiffs must produce evidence that Defendant "'disregard[ed] that known risk by failing to respond to it in an (objectively) reasonable manner.'" *Caldwell,* 748 F.2d at 1099 (quoting *Rodriguez,* 508 F.3d at 617).

a.     *A genuine dispute of material fact exists regarding the subjective requirement that Defendants actually knew they faced a substantial risk of serious harm*

If the disputable issues of fact resolve in their favor, a reasonable jury can find that Plaintiffs satisfy the subjective requirement of demonstrating Defendants actually,

94

subjectively knew Plaintiffs faced a substantial risk of serious harm.   "'Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways.'" *Hale,* 50 F.3d at 1583 (quoting *Farmer,* 511 U.S. at 842).   The official may testify to his own awareness, or the court can draw the inference of awareness from circumstantial evidence.   *Id.; see also Lane*, 835 F.3d at 1308 (citing *Caldwell,* 748 F.3d at 1099) ("Inferences from circumstantial evidence, however, can be used to show that a prison official possessed the necessary knowledge.").   "Thus, 'a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Hale,* 50 F.3d at 1583 (quoting *Farmer,* 511 U.S. at 842).

> For example, if an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk."

*Farmer*, 511 U.S. at 842-43.

In the context of inmate-on-inmate assaults, the plaintiff need not show that he notified an official that he feared an attack.

> Although relevant, a claimant's "failure to give advance notice [of an attack] is not dispositive," *Farmer,* 511 U.S. at [848], 114 S. Ct. at 1984. Thus, an official may not escape liability merely by showing that he did not know the claimant was likely to be assaulted or that an assault would

> be committed by the specific prisoner who eventually committed the assault. *Id.* at [843], 114 S. Ct. at 1982. In other words, Hale was not required to show that Smith knew "precisely who would attack whom," *id.,* but only that Smith had subjective knowledge of a generalized, substantial risk of serious harm from inmate violence. *See id.*

*Hale*, 50 F.3d at 1583 (first alteration in original).

The record reflects that Rutland and Bowling either personally witnessed inmate-on-inmate assaults, or, as Jail Administrators, they received notice of such assaults through incident reports and Jail Tracker entries. Sheriff Williamson stated he "typically" did not receive notice of inmate-on-inmate assaults unless the assault required an inmate to receive hospital treatment. The word "typically" indicates the Sheriff sometimes did receive notice, but the record contains no information from which to determine how frequently such notice occurred. Perhaps by inference vis-à-vis the Sheriff's oversight responsibilities, a reasonable juror could conclude that officers informed Williamson about inmate-on-inmate assaults frequently enough to place him on notice of a constitutional problem.

In any event, Williamson acknowledged receiving notice of each assault that necessitated hospitalization, and fifteen assaults between May 1, 2016, and April 18, 2018, resulted in emergency room treatment. These assaults depicted a plethora of serious injuries among the Plaintiffs and other detainees, as described in the Background: Ogletree's broken jaw necessitating facial surgery; Alexander's broken ribs, cracked sternum, and brain hemorrhage requiring surgery; Kryston's fractured ribs

96

and punctured lung that required a chest tube insertion; James's nasal fracture and contusions to other parts of his body; and Hargrove's broken ribs, jaw, and nose and swollen eye.

The jail logs depict other examples of serious injuries, including:   (1) an inmate losing consciousness on May 5, 2016 (Doc. 91-1, at 6-7); (2) an inmate suffering a black eye, swollen lip, and bruises and footprints on his back on October 23, 2016 (Doc. 91-3, at 9); (3) Peter Capote hitting an inmate four times in the jaw and stomping the inmate's head four times on February 13, 2017 (Doc. 91-2, at 6-7); (4) an inmate "busted up pretty good his face was bloody and black & blue couple cuts" on July 26, 2017; (5) an inmate suffering a possible concussion during a fight on December 11, 2017 (Doc. 91-1, at 4); and (6) an inmate suffering a dislocated shoulder on March 9, 2018.   (Doc. 91-6, at 13).

The extent of the afore-described injuries undergird an inference that the Sheriff possessed knowledge regarding the violence at the jail.   Though Williamson may have not known about each assault that occurred in the jail, the knowledge he did possess, coupled with his knowledge of other circumstances discussed below, provided him with notice of an excessive risk of inmate assaults.

A reasonable juror could conclude that Defendants knew an inmate charged with capital murder presented a risk of increased inmate violence.   Officers attempted to house the five capital murder detainees in other facilities, separated Capote and Young,

and isolated Young in a J-cell because he acted as a leader and discussed violence. Most critically, Rutland conceded that Capote was a "cell boss," in which he ran the cell block at which he was located and typically retained power to administer violence, just "not all the time." (Doc. 85-43 at 32). This fact alone inferentially depicts a knowledge of the alleged, excessive inmate violence risk.

Sheriff Williamson commissioned the NIJO report shortly after taking office in 2015, giving rise to the inference that he knew of other potential problems requiring further attention. The May 2016 NIJO report documented the jail's excessive population and cautioned that routinely exceeding capacity could compromise safety, security, order, discipline, health care, food services, sanitation, exercise, and other essential services.

The report specifically pointed to the danger of increased inmate-on-inmate violence and potentially resulting legal liability. The report also noted that excessive capacity caused deficiencies in inmate classification, which also increased the risk of violent inmates preying upon more vulnerable inmates. The deficiencies in classification and inability to adequately segregate inmates also limited officers' ability to discipline inmates who violate rules, including those who attack other inmates. The report also identified inadequate officer staffing and inadequate video surveillance, which limited officers' ability to respond to inmate-on-inmate assaults and even led to an inmate assaulting an officer during the NIJO inspection period, for which the

offending inmate received no discipline.

The report recommended hiring six new corrections officers, implementing an officer training plan, improving discipline, implementing a classification system, and developing a plan to decrease the inmate population.   Finally, the report documented 32 use-of-force incidents in 2015.   The record contains no details regarding those incidents, but a reasonable juror could conclude that the use of force on 32 occasions during one year indicates safety concerns, as declared by the NIJO report.

A reasonable jury could infer Sheriff Williamson's awareness of the report from the fact that he commissioned it, and from his extensive testimony regarding the contents of the report and his responses to the NIJO's recommendations.   Thus, the Sheriff possessed knowledge of the substantial risks that ensued from the deficient conditions the report described.   *See Marsh,* 268 F.3d at 1029 (state agency inspection reports describing jail conditions gave the Sheriff notice of the risks those conditions posed); *LaMarca,* 995 F.2d at 1536 ("incident reports, internal staff reports, and reports by external investigators" provided notice of an unreasonable risk of inmate violence). In addition, Sheriff Williamson explicitly acknowledged the jail suffered persistent overcrowding and lacked a formal inmate classification system.   *See Hale,* 50 F.3d at 1583 (attributing subjective knowledge to an official who testified he knew inmate-on-inmate violence occurred regularly during periods of overcrowding and violence sometimes resulted in injuries requiring medical treatment).   He also could have

derived subjective knowledge of the other conditions at the jail – including insufficient staffing, surveillance, officer training, and inmate discipline – from their alleged pervasive nature and longstanding existence, if the disputed facts buttress such allegations. *See Marsh,* 268 F.3d at 1029 (attributing notice to the Sheriff of "longstanding and pervasive" conditions); *LaMarca,* 995 F.2d at 1536-37 (attributing notice of jail conditions to an official when such conditions "would be apparent to any knowledgeable observer"); *Q.F.,* 768 F. App'x at 946 ("[T]he defendants' supervisory positions suggest, at least by inference, that the defendants were aware of the staffing, classification, and segregation issues at Eastman.") (citing *Farmer,* 511 U.S. at 842 (allowing the plaintiff to establish subjective knowledge of a risk by inference or from circumstantial evidence)).

There exists no evidence that Rutland or Bowling knew of the NIJO report or its findings. Even so, those Defendants, like Sheriff Williamson, could have derived notice of the conditions at the jail – including overcrowding, lack of a formal classification system, and insufficient staffing, surveillance, officer training, and inmate discipline – from the nature of their positions as Jail Administrator and the longstanding, pervasive presence of the conditions. *See Cottone,* 326 F.3d at 1358 (guards had notice of dangerous conditions when they observed them during their shifts); *Marsh,* 268 F.3d at 1029; *LaMarca,* 995 F.2d at 1536-37. And of course, as

previously noted, they receive notice via incident reports, Jail Tracker entries, and personal involvement in some of the incidents.

Finally, resolution of the evidence in Plaintiffs' favor supports a finding that Defendants possessed knowledge of jail conditions contributing to a substantial risk of excessive inmate assaults before any of the assaults on Plaintiffs occurred. *See LaMarca,* 995 F.2d at 1540 (finding that the district court should have made "a directed inquiry into [the official's] knowledge at the time of each incident"). Though Defendants' notice of Capote's dangerous tendencies and the general risk of inmate violence increased each time Capote assaulted another inmate, and as the general frequency of assaults increased over time, the other specific features discussed provided Defendants with notice of sufficiently dangerous conditions to portray an increased risk of inmate violence even before the first assault on Ogletree on August 10, 2016. As those conditions persisted, they continued to provide Defendants with notice of the risk through the date of the last assault on April 18, 2018. *See id.* at 1540 ("The alleged assaults occurred over a three-year period, and, as one would expect, Turner's knowledge ripened during this period.").

> b.   *A genuine dispute of material fact exists regarding the requirement that Defendants failed to respond to the risk in an objectively reasonable manner*

The court next evaluates whether genuine issues of material fact portray Defendants disregarded the risk of harm Plaintiffs suffered by failing to respond to the

risk in an objectively reasonable manner, or put differently, whether Defendants demonstrated deliberate indifference to the risk of harm to Plaintiffs. *Hale*, 50 F.3d at 1583 ("Mere knowledge of a substantial risk of serious harm, however, is insufficient to show deliberate indifference. Hale also was required to produce evidence that, with knowledge of the substantial risk of serious harm, Smith knowingly or recklessly "'disregard[ed] that risk by failing to take reasonable measures to abate it.'") (alteration in original) (citations omitted).

"[D]eliberate indifference describes a state of mind more blameworthy than negligence," and an ordinary lack of due care for a prisoner's interest or safety will not support the claim. *Farmer*, 511 U.S. at 835; *see also Davidson v. Cannon*, 474 U.S. 344, 347-348 (1986). "Merely negligent failure to protect an inmate from attack does not justify liability under section 1983." *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990); *see also Melton v. Abston*, 841 F.3d 1207, 1223 (11th Cir. 2016) (citing *e.g., McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999); *Carter*, 352 F.3d at 1350. Plaintiffs can demonstrate that Defendants displayed deliberate indifference to the serious risk of inmate-on-inmate assaults if Defendants knew of ways to reduce the risk but knowingly or recklessly declined to take action. *Hale*, 50 F.3d at 1583. If Defendants "attempt[ed] to remedy a constitutionally deficient [jail] condition, but fail[ed] in that endeavor, [they] cannot be deliberately indifferent unless [they] kn[ew] of, but disregard[ed], an appropriate and sufficient alternative." *LaMarca*, 995 F.2d at 1536.

102

That is, "[a]fter establishing that [an] official subjectively knew of a risk, the plaintiff may establish the second element -- that the officials disregarded the known risk -- by showing that the officials failed to respond to that risk in an objectively reasonable manner." *Q.F.*, 768 F. App'x at 944-45 (citing *Rodriguez*, 508 F.3d at 617; *Cottone*, 326 F.3d at 1358); *see also Farmer*, 511 U.S. at 847 (A "prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm *and disregards that risk by failing to take reasonable measures to abate it*.") (emphasis added).

Defendants cannot avoid a finding of deliberate indifference by asserting they lacked funds to implement the necessary corrective measures. "[A]n official 'may not escape liability solely because of the legislature's failure to appropriate requested [and necessary] funds.'" *LaMarca,* 995 F.2d at 1537 (citing *Williams*, 689 F.2d at 1387) (second alteration in original). Rather, when "the lack of funds contributed to the [dangerous] condition," a plaintiff may prevail if he "demonstrate[s] that a particular defendant [nevertheless] had the capability (authority and means) to provide adequate security and did not do so." *Id.* (citing *Williams,* 689 F.2d at 1389).

More specifically, Defendants cannot avoid liability by merely demonstrating efforts toward construction of a new jail, even if the new jail likely would reduce the risk of violence. *Hale,* 50 F.3d at 1584. As the Eleventh Circuit stated in *Hale*:

> While any such efforts by [the Sheriff] would appropriately be considered by a jury determining whether [the Sheriff] was deliberately indifferent, such efforts would not necessarily absolve him or the County of liability. A jury could find that despite any efforts he made toward construction of the new jail, [the Sheriff] was deliberately indifferent by disregarding "alternative means" or interim measures for reducing the risk of violence such as those advanced by Hale, *see LaMarca,* 995 F.2d at 1536.

*Hale,* 50 F.3d at 1584.   The Eleventh Circuit acknowledged that "consideration of alternatives available to [the Sheriff] 'comes perilously close to second-guessing the difficult choices that prison officials must face," but it nonetheless decided to adjudicate within that narrow legal margin because considering such alternatives "'directly addresses the question of whether monetary restraints frustrated [the Sheriff's] good faith efforts, or whether he knowingly or recklessly disregarded solutions within his means."   *Id.* (citing *LaMarca,* 995 F.2d at 1538).

Williamson, Rutland, and Bowling all acknowledged the deficiencies of the existing jail facility.   But those individuals do not possess the power to construct a new jail, as that decision rests with the County Commission, and funding for the construction depends upon political maneuvers the court will allude to later.   Thus, the court must assess whether Plaintiffs sustain their summary judgment burden that Williamson, Rutland, and Bowling knew of, but disregarded, alternative, interim

measures that could have decreased the risk of inmate assaults while Colbert County awaited funding and political initiative for a new jail.[24]

Defendants contend they executed some measures to address circumstances contributing to the increased risk of inmate-on-inmate assaults.  However, genuine disputes of material fact exist as to when Defendants implemented their measures, and whether they were effective in combatting the inmate violence.  *See Spires v. Paul*, 581 F. App'x 786, 794 (11ᵗʰ Cir. 2014) (allegations supports inference that defendant "failed to take measures to abate [alleged unconstitutional condition] in a reasonably timely manner") (citing *Farmer*, 511 U.S. at 847).[25]   Thus, at best, Defendants' efforts, if timely

_____

[24] Regarding the allocation of responsibilities between the Sheriff and Jail Administrator, the record indicates only that the Sheriff bears responsibility "for the care, custody, and control of inmates," while the Jail Administrator bears responsibility for the jail's "day-to-day operations."  (Doc. 85-49, ¶ 3).   The jail policies and procedures challenged here – including inmate classification and discipline, staffing, inmate monitoring, officer training, and managing jail capacity – could reasonably fall under the umbrella of either "care, custody, and control of inmates" or "day-to-day operations" of the jail. Therefore, the court will consider that both the Sheriff and the Jail Administrator possessed the same knowledge of available alternatives, and both retained the authority to address the challenged conditions.   The court bears in mind that Bowling served as Jail Administrator during the time period relevant to Ogletree's and Alexander's claims, and Rutland served as Jail Administrator during the time period relevant to Hargrove's, Kryston's, and James's claims. However, the record does not reflect that the relevant policies and procedures changed meaningfully between those two time periods.   Thus, while Bowling may bear liability only on the claims of Ogletree and Alexander, and Rutland may bear liability only on the claims of Hargrove, Kryston, and James, the deliberate indifference analysis does not differ between those two Defendants.

[25] These observations comport with the opinion of Defendants' expert witness that Sheriff Williamson's efforts to improve jail conditions, coupled with his decision to commission the NIJO report, reflects that he did not display deliberate indifference.  A reasonable juror could credit the expert's testimony, but that testimony does not conclusively establish the Sheriff's lack of deliberate indifference, as a reasonable juror also could conclude, due to when the Sheriff implemented the purported measures and the available alternative measures discussed, that the Sheriff did display deliberate indifference.  *Gregg v. U.S. Indus., Inc.,* 887 F.2d 1462, 1470 (11ᵗʰ Cir. 1989) (citing *Remington*

implemented, did not prove adequate to prevent excessive inmate-on-inmate violence, and Defendants still could display deliberate indifference if they knew about, but declined to implement, reasonable alternative measures.

Regarding inmate classification, Defendants maintained a policy – whose date is not reflected in the record – that separated inmates from known enemies, separated inmates who fought each other, separated pre-trial and sentenced inmates when possible, and separated misdemeanor and felony inmates when possible.  Not only does the policy lack an effective date, Defendants did not effect a classification system requiring the separation of inmates charged with violent offenses from those charged with non-violent offenses, even though the NIJO report recommended the measure. Defendants argue the size of the jail limited their segregation options, but the record reflects other options did exist, as officers now house violent inmates together in a J-cell, as long as those inmates do not face criminal charges on the same case.   Even so, Plaintiffs declare that the number of J-Cells – four total – could have accomplished the separation of Young and Capote into separate confines if they were not placed in adjoining J-cells.

Moreover, a reasonable juror could conclude that Defendants knew the J-cells presented an additional segregation option.  They housed Young in a J-cell, and they

_____

*Arms Co., Inc. v. Wilkins,* 387 F.2d 48, 54 (5th Cir. 1967)).

stated they considered J-cells as an additional segregation option, but they decided not to implement that option because they preferred to use the cells for sex offenders. Yet, the record also indicates they declined to place Capote in a J-cell as a disciplinary measure because the investigators wanted him separated from his co-defendant, Young. Thus, genuine disputes of material fact persist as to whether Defendants reasonably delayed in separating violent inmates into J-cells. Therefore, a reasonable juror could conclude Defendants unreasonably failed to implement known inmate classification and segregation strategies.

As for the specific risk Capote presented to other inmates, that Defendants isolated Young in a J-cell demonstrates they knew they could protect other inmates from the threat a capital murder detainee presented by isolating such detainees from the remainder of the jail population. Furthermore, a reasonable juror may conclude Defendants' disciplinary measures as to Capote failed as he continuously wreaked havoc in the jail. Defendants offered explanations for why they chose not to also isolate Capote, yet, as stated previously, Plaintiffs declare that the number of J-cells – four total – could have accomplished the separation of Young and Capote into separate confines if they were not placed in adjoining J-cells. Therefore, a jury must determine whether

107

those explanations constituted reasonable justifications, or whether Defendants knowingly or recklessly disregarded other viable alternatives for housing Capote.[26]

To discipline inmates who participated in assaults, Defendants declare they sometimes moved such inmates to a drunk tank cell or revoked television, commissary, and visitation privileges.   They also separated the inmates, but a reasonable juror could conclude that practice did not constitute a disciplinary measure.   Defendants contend the size of the facility limited the availability of other options; yet as with segregation, the record reflects other options existed, such as isolating offenders in J-cells, and a reasonable juror could conclude, as with inmate classification, that Defendants knew of that option.

Importantly, the record indicates some instances of inmate violence occurred without *any* disciplinary response, such as when an inmate assaulted an officer during the NIJO audit period, or when the officers merely separated inmates after assaults. And in light of the NIJO's recommendation to implement a disciplinary system, a reasonable factfinder could conclude that Defendants unreasonably failed to implement

---

[26] For instance, Defendants asserted they could not house Capote in a J-Cell near Young because the two men did not get along and their ability to communicate might compromise the prosecution.   They chose to prioritize isolating Young over Capote because Young acted as a leader, referred to violence in conversations, and possessed a larger frame than Capote.   Defendants also asserted that isolating Capote in a J-Cell or cell block would have resulted in the loss of beds for other inmates, which would further exacerbate the overcrowding problem.   They expressed concern that imposing extended isolation on a pretrial detainee might violate his constitutional rights, as no jury had yet convicted Capote of a crime. (*See* Doc. 88, at 29-31).

available measures to effectively discipline inmates.   Therefore, genuine disputes of material facts exist as to whether Defendants could have reasonably effected more disciplinary measures during the time period at issue.

As for staffing and monitoring, Defendants knew from the NIJO report that hiring additional jailers could reduce the risk of inmate-on-inmate violence and other problems, and the NIJO recommended at least six additional jailers.   Defendants declare they attempted to schedule two to four officers on each shift, with one officer monitoring cameras and phones from the control room and the other officer roving the cell block areas and performing observation checks every 15 to 20 minutes.     The Sheriff also declares he increased staffing after receiving the NIJO report, but a reasonable juror could interpret the budget increase to reflect that the County hired additional jailers, but not that it hired the six additional jailers the NIJO recommended, especially considering that the Sheriff also stated he increased salaries for existing officers.   Importantly, the Sheriff never stated that the County denied a request to fund additional jailer salaries, thereby leading to the reasonable inference that he could have successfully requested even more funding.   Thus, a reasonable juror could conclude Defendants failed to reasonably respond to the alleged risk by adequately staffing the jail.

Relatedly, the Sheriff replaced the control room camera system after receiving the NIJO report, but he did not add any additional cameras to the cell block areas, and

officers remained unable to view activity within the cells.   The Sheriff knew additional cameras could provide additional security because the NIJO report pointed out that blind spots in surveillance could create a security risk.   He looked into the possibility of installing more cameras but declined to do so because of the cost and the potential futility of placing cameras within inmates' reach.   Based on the foregoing, a reasonable juror could conclude that Defendants failed to reasonably respond to the alleged risk by implementing available measures to improve inmate monitoring.

As for officer training, Defendants knew additional training could provide a safer jail atmosphere because the NIJO recommended it.   In response to the NIJO's recommendation, the Sheriff declared he implemented additional training measures, reflecting that the Sheriff knew about potential training options and the effect they would have on inmate security.   However, the Sheriff's testimony displayed a genuine dispute of material fact regarding whether the Jail Administrator solely received additional training, or whether jailers also received the training.   In light of jailer Halcomb's testimony that he did not receive any training between 2011 and 2019, a reasonable juror could conclude that the Sheriff failed to reasonably respond to the recommendation to implement officer training despite knowing of both the potential benefit and the availability of training.

To address jail overcrowding, the Sheriff declared he asked other counties to house inmates, asked judges to release inmates or lower their bonds, and communicated

with local prosecutors.   Thus, the record reflects the Sheriff knew of potential methods to reduce the inmate population.   However, he only began to implement those measures when the jail population reached 90 or 100 detainees, indicating that he tolerated populations up to 1.56 times the 64-inmate capacity before taking action.   A reasonable juror could therefore conclude that the Sheriff unreasonably failed to implement known measures to ameliorate overcrowding.

Even if none of these actions or omissions, standing alone, could suffice to demonstrate Defendants' deliberate indifference to an excessive risk of inmate violence, a reasonable juror could conclude the facts, taken as a whole in the light most favorable to Plaintiffs with all reasonable inferences accorded thereto, demonstrate Defendants unreasonably failed to take advantage of available options, short of building a new jail, to decrease the alleged excessive risk of inmate violence.[27]   *See LaMarca,* 995 F.2d at 1538 (finding potential liability for a prison superintendent's deliberate indifference even though the superintendent made "good faith efforts to resolve the dilemmas facing" the prison, because the superintendent nonetheless "recklessly disregarded [other] necessary means to protect inmate safety."); *see also Marsh,* 268 F.3d at 1029; *Gates*, 501 F.2d at 1309; *Williams,* 547 F.2d at 1211.   Although Defendants argue that

---

[27] A reasonable jury also could conclude Defendants demonstrated only negligence, not deliberate indifference.   But that determination must remain with the jury, depending upon the resolution of disputed material facts.

they could not be expected to implement the NIJO's recommendations immediately upon receipt of the report, the previously-discussed genuine issues of material fact query whether they unreasonably delayed implementing certain measures in view of the alleged, excessive risk of inmate violence at the facility.

And, clearly established law gave Defendants fair notice that they would violate Plaintiffs' Fourteenth Amendment rights if they knew of, but failed to implement, reasonable measures to address excessive risk of inmate violence.   *See Hale,* 50 F.3d at 1584; *LaMarca,* 995 F.2d at 1536-38.   Thus, if a jury found Defendants demonstrated deliberate indifference by failing to implement such measures, that finding would represent a violation of clearly established law.

> **3.      A genuine dispute of material facts exists regarding whether the alleged deliberate indifference to a substantial risk of serious harm caused Plaintiffs' injuries**

Finally, Plaintiffs must sustain their summary judgment burden of demonstrating Defendants' deliberate indifference to a substantial risk of serious harm caused their constitutional injuries.   To do so, plaintiffs must provide evidence to support "two causal links: first, a link between [Defendants'] allegedly deliberately indifferent acts and omissions and the excessive risk of violence; and second, a link between the excessive risk of violence and [their] injur[ies]."   *Hale,* 530 F.3d at 1584 (citing *LaMarca,* 995 F.2d at 1538).

> If a plaintiff establishes a causal link between the defendant's acts or omissions and the infirm condition, the defendant is precluded from contending that the unconstitutional condition was not at least a proximate cause of . . . injuries that arose from that condition.  This is not to say that a plaintiff need not show a causal link between the constitutionally infirm condition and the alleged injuries.  Rather, the finding that a prison condition offends the [Fourteenth] Amendment presupposes the distinct likelihood that the harm threatened will result.  The wrong in [Fourteenth] Amendment cases is the deliberate indifference to a constitutionally infirm condition; that wrong must, in turn, have been the proximate cause of the plaintiffs' injuries, here the injuries brought about by the assaults.

*Hale,* 530 F.3d at 1584 (quoting *LaMarca,* 995 F.2d at 1538) (quotation & citation omitted).

Plaintiffs provide evidence to support both causal links.  First, disputed facts resolved in Plaintiffs' favor can establish a link between Defendants' allegedly deliberately indifferent acts and omissions and the excessive risk of inmate violence in the Colbert County Jail.   The following discussion from the Eleventh Circuit's opinion in *Hale* confirms such a link existed if facts resolve in Plaintiffs' favor:

> Hale argues that without Smith's failure to take meaningful action as described above, the infirm condition — the excessive risk of violence — would not have existed, and he would not have been beaten.  In *LaMarca,* we considered the causal relationship between a prison official's failure to improve prison safety and an excessive rate of violent, inmate-on-inmate, sexual assaults.  We confirmed that "due to [their] very nature as acts of violence, the rapes that occurred are not isolated incidents of sexual conduct, but rather flow directly from these lawless prison conditions at GCI. . . .   [These conditions created] the background and climate which . . . preordained homosexual rapes and other inmate assault[s]." *Id.* at 1539 (quotation omitted; ellipses & brackets in *LaMarca*).  Because a "finding that a prison condition offends the [Fourteenth

113

Amendment presupposes the distinct likelihood that the harm threatened will result," *id.* at 1538, we further held that "[t]he evidence thus permits a finding of a causal link between the objectively intolerable conditions at GCI and the plaintiffs' injuries," *id.* at 1539.

As in *LaMarca,* Hale's evidence is sufficient to support a reasonable jury determination that the excessive risk of violence flowed from an atmosphere of deliberate indifference reflected in Smith's failure to classify or segregate violent from non-violent inmates, assign inmates to cells or beds, adequately train the jailers, and adequately supervise and monitor the inmates. As in *LaMarca,* a reasonable jury could find that the beating was caused by the excessive risk of harm which resulted from the atmosphere of deliberate indifference. Accordingly, Hale presented sufficient proof of causation to survive summary judgment.

*Hale*, 50 F.3d at 1584-85 (alterations and omissions in original).

In the present cases, as in *Hale* and *LaMarca,* a genuine dispute of material fact exists whether the alleged excessive risk of inmate violence flowed naturally and directly from the alleged failure of Defendants to avail themselves of known, available measures to improve overcrowding, segregation, discipline, staffing, monitoring, and training at the jail. Defendants purportedly adopted measures recommended by the NIJO report to address the documented concerns, albeit with disputed material facts as to when the Defendants implemented them. The adoption of these measures reflects their utility in addressing the problems noted by the NIJO report, and a reasonable jury could determine it also signals Defendants' implicit acknowledgement that the absence of these measures caused the alleged excessive inmate violence at the jail.

114

Moreover, because this court's finding that the disputed conditions at the Colbert County Jail presented a substantial risk of serious harm from inmate attacks presupposes the distinct likelihood that inmate-on-inmate attacks will result, a reasonable factfinder may conclude that a causal link exists between the jail conditions and Plaintiffs' injuries.   That is, the disputed conditions in existence during the applicable time period – May 2016 to April 2018 – allegedly created the "background and climate" preordaining the alleged excessive risk of inmate violence.   The alleged circumstances thus would permit a finding of a causal link between the alleged objectively intolerable conditions at the Colbert County Jail and the Plaintiffs' injuries.

Thus, the court finds Plaintiffs have presented a triable question regarding whether a causal connection existed between the alleged deliberate indifference to a substantial risk of excessive inmate assaults and the injuries Plaintiffs suffered.

In summary, Plaintiffs have presented sufficient evidence from which a reasonable juror could conclude that Defendants demonstrated deliberate indifference to a substantial risk of serious harm from excessive inmate-on-inmate attacks, and that such deliberate indifference caused their constitutional injuries.

Finally, applicable Eleventh Circuit authority clearly established that an official's deliberate indifference to dangerous conditions causes an elevated risk of inmate violence, and that an elevated risk of inmate violence causes any injuries a plaintiff suffers as a result of such violence.   *See Hale,* 530 F.3d at 158; *LaMarca,* 995 F.2d at

1538-39.   Thus, if a jury found Defendants demonstrated deliberate indifference by failing to implement available measures to reduce an excessive risk of inmate violence, clearly established law would dictate that Defendants' deliberate indifference caused Plaintiffs' injuries.

In summary, if a jury found Williamson, Bowling, and Rutland demonstrated deliberate indifference to an excessive risk of inmate violence, that finding would represent a violation of clearly established law.   Therefore, qualified immunity does not protect Williamson, Bowling, and Rutland from liability on Plaintiffs' excessive inmate violence claims at this juncture.   The court will deny Defendants' motion for summary judgment in their favor on those claims.

### III.   Plaintiffs Cannot Demonstrate Colbert County Displayed Deliberate Indifference Regarding its Statutory Duty to Maintain the Jail

Plaintiffs assert Colbert County displayed deliberate indifference to the "longstanding need for a jail that could safely house inmates." (Doc. 93, at 65).   A local government can incur direct constitutional liability "due to its acts or omissions," but "only for acts for which the local government is actually responsible." *Marsh*, 268 F.3d at 1027 (citations omitted).

The Alabama Code defines the County's duties regarding the jail.   Each County Commission within the state "shall be required to maintain a jail within their county." Ala. Code § 11-14-10.   "The county jail must be of sufficient size and strength to

116

contain and keep securely the prisoners which may be confined therein and must contain at least two apartments, properly ventilated so as to secure the health of those confined therein: One for men and one for women." Ala. Code § 11-14-13.   Another Code section requires each jail to "be fireproof, properly ventilated, sufficiently lighted by day and night, adequately heated and [to] contain adequate sanitary plumbing and sewerage connections."   Ala Code § 14-6-103.   "It is the duty of the county commission, if there is not a sufficient jail in its county, to levy a county tax for the erection thereof and cause proposals to be issued for building or repairing the same within 12 months thereafter." Ala. Code § 11-14-14.

Thus, "the duty of the county to erect and maintain a county jail pertains exclusively to the physical plant of the jail." *Turquitt v. Jefferson Cty., Ala.*, 137 F.3d 1285, 1290 (11th Cir. 1998).   "The duty to 'maintain a jail' under § 11-14-10 is merely the duty to keep the 'jail and all equipment therein in a state of repair and to preserve it from failure or decline.'"   *Id.* (quoting *Keeton v. Fayette County,* 558 So. 2d 884, 886 (Ala. 1989)).   The County has "no responsibility for daily operation of county jails and no authority to dictate how jails are run."   *Marsh,* 268 F.3d at 1027; *see also Turquitt,* 137 F.3d at 1289 ("[N]one of [the county's] duties relates to the daily operation of the jails or to the supervision of inmates.").   As the County only has a duty to erect and maintain the jail, it can incur Fourteenth Amendment liability only "if its failure to

maintain the Jail constituted deliberate indifference to a substantial risk of serious harm to the prisoners." *Marsh*, 268 F.3d at 1027.

Plaintiffs do not appear to argue that the County failed to allocate sufficient funds to maintain the existing jail facility at an adequate level.[28]   Rather, they claim the existing facility is not "of sufficient size and strength," and they argue that the County could meet the challenges in inmate housing, segregation, and monitoring and its constitutional obligation to maintain inmate safety *only* by constructing a new jail. Plaintiffs assert that County officials

> have known for decades that the jail was unable to safely house the inmate population for numerous reasons and that a new jail was necessary due to the security issues presented by, among other things, overcrowding, the open barrack housing, the lack of segregation cells, and the limited []ability of jailers to monitor inmates.

(Doc. 93, at 12).   According to Plaintiffs, those deficiencies "directly affected [the Sheriff's] ability to control inmate-on-inmate violence."   (*Id.* at 66).[29]

---

[28] If Plaintiffs did present such an argument, the evidence does not support it.   The uncontroverted evidence demonstrates the County's maintenance department prioritizes jail maintenance tasks over other maintenance tasks, and the department recently performed such tasks as remodeling the elevator, shower, and dispatch areas of the jail; painting the entire facility; and installing new HVAC systems.   The County Commission also has increased the jail's funding each year, enabling additional jailer positions (at least beyond the period of time challenged by Plaintiffs), increased jailer pay, additional supplies, and repairs.   The Sheriff's Office and jail operations budgets comprise approximately 40% of the county's total expenditures, which equates to approximately 48% after factoring out earmarked expenditures.

[29] As Plaintiffs focus upon the construction of a new jail facility, not the adequacy of the County's expenditures to maintain the current facility, the opinion of Defendants' expert that the County's increase of funding to the jail demonstrates the County's lack of deliberate indifference does not bear relevance on this inquiry.

However, the jail's inadequacies only implicate the Fourteenth Amendment if those inadequacies actually resulted in a substantial risk of serious harm to Plaintiffs, and if the County's deliberate indifference to that risk caused Plaintiffs' injuries. *See Goodman,* 718 F.3d at 1331 (citation omitted) (a deliberate indifference claim requires proof of "'(1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation.'").

As discussed, Plaintiffs have presented a triable issue regarding whether they suffered a substantial risk of inmate violence due to conditions at the Colbert County Jail. In addition, a reasonable juror could conclude the small size of the jail facility increased that risk because it limited officers' options for discipline and inmate segregation.

However, Plaintiffs cannot demonstrate the County displayed deliberate indifference to the substantial risk of serious harm. Even if Plaintiffs could establish the County subjectively knew of a substantial risk of serious inmate harm, they cannot establish the County disregarded that risk by failing to respond to it in an objectively reasonable manner.

The County has formed committees to explore options for constructing a new jail, and it has even obtained building cost estimates, indicating the County has devoted attention to the need for a new jail facility. However, the County's efforts have never borne fruit because political circumstances beyond the County's control have prevented

119

the County from obtaining the funds necessary for construction.  The County lacks the $20,000,000 or more to cover building cost estimates, so it must obtain the funds by levying a tax.   Unfortunately, the County lacks the power to levy such a tax without first convincing the local delegation of the Alabama legislature to propose an act, then obtaining an such act from the Alabama legislature, and then obtaining the approval of a majority of voters.  The political will has not yet existed either within the local legislative delegation, or within the local community, to support such a proposal.

As discussed, the County cannot face liability for deliberate indifference if it failed to take an action beyond its control. *See Marsh,* 268 F.3d at 1027.  Due to the structure of this State's system for effecting taxation, the Alabama legislature and the voting public – not the Colbert County Commission – control whether Colbert County will build a new jail facility.

Plaintiffs rely upon the Eleventh Circuit's decision in *Moore v. Morgan,* 922 F.2d 1553 (11th Cir. 1991) for their entreaty.   In *Moore,* the Plaintiff sued the Chambers County Sheriff and County Commissioners for unconstitutional jail conditions "due to overcrowding and other factors." *Id.* at 1555.  The plaintiff did not establish a deliberate indifference claim, but he did establish an Eighth Amendment cruel and unusual punishment claim.   As the district court found, "[n]o one can seriously argue that the Chambers County Jail was not unconstitutionally overcrowded while the plaintiff was there," and the effects of overcrowding compounded because inmates

120

never left their cells.   *Id.* at 1555 n.1.   The Eleventh Circuit's opinion addressed whether the violations resulted from the County's custom or policy of failing to appropriately maintain the jail.   The Court found:

> In this case, faced with the duty of maintaining the county jail, Chambers County failed to satisfy its constitutional responsibility.   In 1982, when the Chambers County jail began to become overcrowded, the sheriff and the county commissioners discussed ways to solve the space problem.   The county authorized a study to explore the possibility of constructing a new jail, but took no action at that time.   In August, 1986, the sheriff again approached the county commission and requested that the county take action on funding a new jail.   The commissioners authorized a straw vote to be placed on the November 5, 1986 ballot.   By this vote, the citizens chose to construct a new jail and to finance it through the use of a one-cent sales tax.   The commissioners then asked the state legislative delegation to introduce legislation for a binding referendum on the jail and the new jail funding issue, but the delegation did not do so.   The Chambers County legislative delegation informed the county commission that it would not introduce any legislation authorizing the county to levy a new tax unless the voters approved it in advance by referendum.   On March 8, 1988, by referendum, the voters overwhelmingly rejected the proposal to levy a tax to build a new jail.
>
> After Moore brought this case against the county, however, the commissioners bought a facility to house 25 inmates, authorized the hiring of 4 jailers, and by cutting funding from other county agencies provided funds to construct a new jail facility with 100 to 200 beds.   Construction of a new jail was ultimately financed by a bond issue to be retired by legislatively-enacted tangible personal property rental taxes, excise taxes, and assessments to costs in criminal court cases.   The ways in which the commissioners actually obtained the money to finance the necessary jail improvements, when put under the threat of litigation, provides compelling evidence of the fact that the commissioners could have taken steps to improve the jail at a much earlier date. The commissioners' policy of delayed action, and the unconstitutional conditions in the jail that resulted, render the commissioners liable in their official capacities, and

consequently the county, liable.  *Monell[ v. Dep't of Soc. Servs. of City of New York]*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).

*Moore*, 922 F.2d at 1556-57 (footnote omitted).

In the present case, there exists no evidence that Colbert County raised or allocated funds for construction outside the described procedure for levying a special tax when faced with the threat of litigation or at any other time.  Thus, the evidence does not indicate that the County failed to take advantage of available, alternative methods for bringing the jail facility into Constitutional compliance, and *Moore* does not provide a basis for holding the County liable for deliberate indifference.

Plaintiffs also argue that insufficient funding cannot excuse the County's failure to construct a Constitutionally adequate jail.  Indeed, "lack of funds for facilities does not justify the maintenance of unconstitutional jail conditions."  *Moore,* 922 F.2d at 1557 n.4 (citing *Anderson v. City of Atlanta,* 778 F.2d 678, 688 n. 14 (11th Cir. 1985); *Smith v. Sullivan,* 611 F.2d 1039, 1043-44 (5th Cir. 1980)).  As discussed, when an official cites lacks of funds as a factor contributing to a dangerous condition, the plaintiff will still prevail if he can "demonstrate[] that a particular defendant [nevertheless] had the capability (authority and means) to provide adequate security and did not do so." *LaMarca,* 995 F.2d at 1537 (citing *Williams,* 689 F.2d at 1389).

Here, there exists no evidence that the County possessed the ability, absent a legislative act, to raise the funds to construct an adequate jail facility.  For example, the

evidence does not indicate that the County has chosen to prioritize road maintenance or waste disposal over the needs of the jail.  Rather, no matter how the County allocated its current funding, it could not afford a new jail, and it can only increase the available funding by levying a new tax, which requires political will the County Commission neither possesses nor controls.

In summary, Plaintiffs cannot establish the requirements of a deliberate indifference claim because they cannot demonstrate the County deliberately turned a blind eye to the risk they would suffer serious harm.

## CONCLUSION AND ORDERS

For the reasons stated herein, the court **GRANTS** Defendants' motion for summary judgment as to Defendant Heath Halcomb, and as to Defendant Marcus Rutland, in his capacity as a jailer.

The court also **GRANTS** Defendants' motion for summary judgment as to all of Plaintiffs' claims for injunctive and declaratory relief.

Due to genuine disputes of material fact as chronicled herein, and the consideration that a reasonable factfinder at trial may find in Plaintiffs' favor if those disputes resolve in their favor, the court **DENIES** Defendants Williamson, Rutland (in his capacity as Jail Administrator), and Bowling's motion for summary judgment as to qualified immunity on Plaintiffs' claim for deliberate indifference to excessive inmate violence.

However, as the evidence does not support Plaintiffs' claims for deliberate indifference against Colbert County, the court **GRANTS** Defendants' motion for summary judgment as to Colbert County.

**DONE** and **ORDERED** this 30th day of September, 2021.

_____
HERMAN N. JOHNSON, JR.
UNITED STATES MAGISTRATE JUDGE